Rubie **ROGERS, Willie Wadsworth, Donna Hunt, James Colleran, Harold Warner, Elizabeth Bybel, Able Bolden, for themselves and on behalf of all persons similarly situated, Plaintiffs,**

v.

Robert **OKIN, M.D., Commissioner of the Department of Mental Health of the Commonwealth of Massachusetts, Richard Kahn, M.D., William Malamud, M.D., David Seil, M.D., Michael Gill, M.D., Elliot Schildkrout, M.D., Sanford Pomerantz, M.D., Jean Turnquest, M.D., Allan Siegel, Eugene Cacciola, M.D., Brian Mazmanian, M.D., Michael Osborne, M.D., John Szlyk, M.D., William Kantar, M.D., John Goodman, M.D., Defendants.**

CA 75–1610–T.

United States District Court, D. Massachusetts.

Oct. 29, 1979.

Greater Boston Legal Services, Roxbury, Mass., Richard W. Cole, Robert Burdick, Mary Ashbury, and Shubow, Stahlin & Bergstresser, Inc., Clyde D. Bergstresser, Boston, Mass., for plaintiffs.

Marvin C. Guthrie, Needham, Mass., for guardian ad litem.

Powers & Hall, Douglas Danner, Spencer J. Dreischarf, Marcia Sneden, Boston, Mass., for defendants Drs. William Malamud, Brian Mazmanian, Eugene Cacciola, Jeffrey Goldbarg, John Goodman, Michael Osborne, Sanford Pomerantz and Jean Turnquest.

Francis X. Bellotti, Atty. Gen., Stephen Schultz, Leah S. Crothers, Asst. Attys. Gen., Boston, Mass., for defendants Drs. Michael Gill, William Kantar, John Szlyk, Elliot Schildkrout, David Seil, Richard Kahn, William Malamud, Allan Siegel, Brian Mazmanian, Sanford Pomerantz, Jean Turnquest and Robert Okin.

Finnerty & Finnerty, John F. Finnerty, Jr., Boston, Mass., for Dr. Michael Gill.

Ficksman & Conley, David M. Gould, Boston, Mass., for Drs. John Szlyk, Richard Kahn and Allan Siegel.

Martin, MaGunson, McCarthy & Kenney, Charles Reidy, III, Raymond J. Kenney, Jr., Boston, Mass., for Drs. Elliot Schlidkrout, John Goodman, Jeffrey Goldbarg, Eugene Cacciola and Michael Osborne.

TAURO, District Judge.

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Introduction | 1352 |
| II. | Procedural Background | 1353 |
| III. | The Parties | 1354 |
| | A. Plaintiffs | 1354 |
| | B. Defendants | 1354 |
| IV. | Boston State Hospital Facilities and Personnel | 1355 |
| | A. The Austin Unit | 1356 |
| | B. The May Unit | 1357 |
| V. | Procedures for Commitment to the Boston State Hospital | 1358 |
| | A. Conditional Voluntary Admission | 1358 |
| | B. Involuntary Temporary Hospitalization for 10 Days | 1358 |
| | C. Involuntary Prolonged Civil Commitment | 1358 |
| | D. Commitment of Alleged Alcoholics | 1358 |
| | E. Admission and Retention of the Mentally Retarded | 1358 |
| VI. | Department of Mental Health Regulations Concerning Treatment at Boston State Hospital | 1359 |
| VII. | Anti-Psychotic Drugs | 1359 |
| VIII. | The Injunction Claim against Medication Practices | 1360 |
| | A. The Competency of Mental Patients to Refuse Treatment | 1361 |
| | B. Guardianship | 1362 |
| | C. The Right to Refuse Treatment in an Emergency | 1364 |
| | D. The Right to Refuse Treatment in a Non-Emergency | 1365 |
| | 1. The Involuntary Patient's Right to Refuse Treatment | 1365 |
| | a. The Involuntary Patient's Right to Privacy | 1365 |
| | b. The Involuntary Patient's First Amendment Rights | 1366 |
| | 2. The Voluntary Patient's Right to Refuse Treatment | 1367 |
| | E. The Commonwealth's Interests | 1368 |

| | | | |
|---|---|---|---|
| IX. | Seclusion | | 1371 |
| | A. | Seclusion Statutes and Regulations | 1371 |
| | B. | Seclusion Facilities at the Austin and May Units | 1372 |
| | C. | Seclusion Practices at the Austin and May Units | 1373 |
| | | 1. The Austin Unit | 1373 |
| | | 2. The May Unit | 1373 |
| | D. | Discussion | 1374 |
| X. | Named Plaintiffs' Claims for Damages | | 1375 |
| | A. | Findings of Fact Related to Damages Claims | 1375 |
| | | 1. May Unit Plaintiffs | 1375 |
| | | a. Medication | 1375 |
| | | b. Seclusion | 1376 |
| | | 2. Austin Unit Plaintiffs | 1377 |
| | | a. Medication | 1378 |
| | | b. Seclusion | 1378 |
| | B. | Legal Conclusions Related to Damages Claims | 1380 |
| | | 1. Plaintiffs' Federal Claims | 1380 |
| | | 2. Plaintiffs' State Claims | 1383 |
| | | a. Assault and Battery, False Imprisonment | 1383 |
| | | b. Malpractice | 1384 |
| | | 1. Medication Negligence Claims | 1386 |
| | | 2. Seclusion Negligence Claims | 1388 |

## OPINION

### I. *INTRODUCTION*

This class action involves a multi-faceted attack against certain medication and seclusion policies allegedly followed at the May and Austin Units of the Boston State Hospital (Hospital), a state institution for the mentally ill. The named plaintiffs, all either voluntary or involuntary patients at one time or another at these facilities, seek injunctive relief for the class,[1] and award of money damages for themselves.

Plaintiffs' basic grievance is that the defendants, all of whom have served on the Hospital staff, maintained policies of forced medication and involuntary seclusion in non-emergency circumstances. Plaintiffs allege that these policies infringed on the constitutional rights of Hospital patients. In addition, they allege that such policies violated standards of acceptable medical care.

With respect to the challenged medication practices, plaintiffs theorize that, although they have a right to receive treatment when confined at a state mental institution, they, nonetheless, have a constitutional right to refuse such treatment. Plaintiffs acknowledge, however, that their asserted right to refuse treatment is not absolute, and must yield to the Hospital's right to impose treatment in order to protect their safety or that of other patients and Hospital staff. Absent such emergency circumstances, plaintiffs maintain they are competent to decide whether or not to receive certain treatment, and that their decisions must be respected by Hospital staff.

As for the seclusion issue, plaintiffs maintain that state law permitted defendants to restrain patients in seclusion rooms only when there was a substantial threat of physical harm to patients or staff.[2] Plaintiffs allege that, notwithstanding such stat-

---

1. On October 16, 1975, this court certified a class consisting of "all persons, who are presently, or will be, patients at the May and Austin Units of Boston State Hospital and who have been or will be secluded without their consent or medicated without their consent."

2. M.G.L.A. ch. 123, § 21 provides that "restraint may be used only in cases of emergency such as the occurrence of, or serious threat of, extreme violence, personal injury, or attempted suicide."

utory proscription, defendants routinely employed seclusion as a treatment modality, and not merely as an emergency restraint.

The defendants have primary and fall back positions with respect to plaintiffs' allegations and claims. Their fundamental defense is that patients committed to a state mental institution, whether voluntary or involuntary, are incompetent to make treatment choices. Defendants assert that mental patients are committed to mental hospitals for treatment, and that the state has a *parens patriae* obligation and right to provide that treatment, even in the face of opposition by the patient. In short, defendants argue that committed mental patients[3] have no constitutional right to refuse treatment in either an emergency or non-emergency situation. Defendants concede, however, that any treatment provided must be consistent with reasonably accepted standards of medical practice.

In addition to their legal contention, defendants offer a factual defense to plaintiffs' medication claims. They maintain that none of the named plaintiffs was forcibly medicated in a non-emergency. Moreover, defendants assert that no patient at the Hospital was forcibly medicated unless there was at least a "psychiatric emergency," a term they define as the foreseeable deterioration of the patient absent medication.

Concerning the seclusion issue, defendants concede that M.G.L.A. ch. 123, § 21 is the controlling standard. They maintain, however, that no patient was secluded in violation of that standard.

The examination of these medication and seclusion issues involved 72 trial days, more than 8,000 pages of transcript and over 2,300 pages of post-trial briefs. The findings and conclusions of this court concerning these issues are set forth below.

## II. *PROCEDURAL BACKGROUND*

This action was commenced on April 27, 1975, when several patients at the May and Austin Units of Boston State Hospital filed a civil rights action under 42 U.S.C. § 1983 seeking to enjoin certain seclusion and medication practices at the Hospital and to recover compensatory and punitive damages from those responsible for such practices.

On April 30, 1975, this court issued a temporary restraining order prohibiting non-emergency seclusion and medication of voluntary or involuntary patients without their informed consent, or that of a guardian in the case of an incompetent. On May 8, 1975, the parties agreed to an extension of the temporary restraining order until a hearing on preliminary or permanent relief was concluded. Such a hearing commenced in the fall of 1975 and continued for a period of six trial days. Further hearing was then suspended while the court and the parties attempted to settle the complex issues involved. Those efforts continued until June of 1976 when, because of seemingly irreconcilable differences, a merged trial on preliminary and permanent injunctive relief was scheduled for June 21, 1976.

Subsequent to that scheduling, defendants filed motions for summary judgment on all damages claims and on the injunctive claims relating to the use of seclusion at the Hospital. The June 21, 1976 date was utilized for hearing on these motions rather than trial on the merits. The motions were denied on March 25, 1977.

On March 25, 1977, this court also denied defendants' motion to dissolve the temporary order restraining forced medication. That decision was appealed and arguments were held on September 9, 1977 by the First Circuit Court of Appeals. An order affirming this court was issued on December 8, 1977.

All action in the case had been stayed pending appeal. Trial on the merits commenced in December of 1977 and concluded on January 31, 1979. Seventy-two trial days were dedicated to the testimony of more than 50 witnesses, most of whom were

---

3. Massachusetts law provides for both voluntary and involuntary commitments. *See* Sec. V *infra.*

psychiatrists, psychologists or other professionals. During the next several months, the parties prepared extensive post-trial briefs and proposed findings of fact. The case was taken under advisement on August 15, 1979, following final oral argument.

## III. THE PARTIES

### A. Plaintiffs

ABLE BOLDEN, age 46, was first hospitalized at Massachusetts Mental Health Center in 1953. During the next twenty years, he was admitted to various state hospitals, primarily because of episodic violent behavior. In December of 1974, he was involuntarily committed to the May Unit for 10 days. On January 3, 1975, Bolden was again admitted to the May Unit, this time for a 20 day observation which was extended to February 12, 1975. On February 22, 1975, he was involuntarily committed on a temporary 10 day admission,[4] and on March 25, 1975, he was again involuntarily committed, this time for six months.

BETTY BYBEL, age 38, was first admitted to the Austin Unit for observation by a court order on January 3, 1973. She had two prior hospitalizations for the treatment of mental illness, first in New Jersey (1967) and again in Massachusetts (1972). Between January 3, 1973 and April 25, 1975, she was admitted to the Austin Unit on approximately 28 occasions, sometimes voluntarily and sometimes involuntarily.

JAMES COLLERAN, age 21, was first admitted to the Austin Unit for six months. From August 11, 1974 to December 10, 1974, he was held at the Austin Unit pending a court commitment hearing. That hearing resulted in an involuntary commitment through June 9, 1975. He is one of eleven children. Both of his parents, now dead, suffered from mental illness. For the past ten years, he has had many encounters with the juvenile court system. Prior to his Austin admission, he was involved in episodes of violence.

DONNA HUNT, age 20, was first admitted to the Austin Unit in January 1974 on an involuntary ten day commitment. Her mother signed a conditional voluntary commitment contract on her behalf in January of 1974. After becoming 16, Donna agreed to a voluntary commitment. She remained in that status from May 1974 until August 1975, when she was involuntarily committed to the Austin Unit. When she was three years old she contracted measles encephalitis, which apparently resulted in organic brain damage. Her record demonstrates many instances of violent behavior.

RUBIE ROGERS, a woman in her late thirties, has had a number of May Unit admissions and discharges since 1965. From January 1971 to April 1975, she was a voluntary patient. She has had a history of thought disorder, hallucinations and delusions, with occasional episodes of self-destructive and violent behavior.

WILLIE WADSWORTH, age 29, was transferred to the May Unit from Bridgewater State Hospital on April 17, 1974, and was involuntarily committed until April 16, 1975. A large and powerfully built man, he was first admitted to a mental hospital at age 17.

HAROLD WARNER, age 52, spent seventeen years at Bridgewater State Hospital after conviction of assault and battery of a twelve year old girl. In August of 1974, he was released by order of the Superior Court and admitted to the May Unit as an involuntary patient.

### B. Defendants

EUGENE CACCIOLA received his M.D. in 1974 from Tufts University. From January to July, 1975, he was a resident on ward 4 of the May Unit. Claims have been brought against him by Rubie Rogers, Able Bolden, and Harold Warner.

MICHAEL GILL received his M.D. from the Royal College of Surgeons in Dublin, Ireland. He took his residency at Boston State Hospital from 1959 to 1962 and became board certified in psychiatry in 1964.

---

4. See Sec. V(B) infra.

He founded the Austin Unit in 1966 and held the position of director until 1977. Dr. Gill is being sued by Donna Hunt, James Colleran, and Elizabeth Bybel.

JOHN GOODMAN received his M.D. from Boston University in 1974. From January to June, 1975, he was a resident on ward 3 of the May Unit. Claims against him have been brought by Willie Wadsworth and Able Bolden.

RICHARD J. KAHN received his M.D. from Harvard University in 1955. He spent two years as a psychiatric resident at Boston State Hospital. From January 1970 through August of 1974, he was inpatient director of the May Unit. He is board certified in psychiatry. Claims have been brought against him by Rubie Rogers and Harold Warner.

WILLIAM G. KANTAR received his M.D. in 1962 from Tufts University. From 1969 to January of 1977, he was a member of the staff of the Austin Unit, serving as senior and clinical director of psychiatry. He has been board certified in psychiatry since 1963. Claims have been brought against him by Donna Hunt, James Colleran, and Elizabeth Bybel.

WILLIAM MALAMUD received his M.D. from Boston University in 1954. From 1955 to 1956, he was a psychiatric resident at Boston State Hospital. On September 1, 1974, Dr. Malamud became assistant superintendent for clinical affairs at the Solomon Carter Fuller Mental Health Center. From September 1, 1974, when Dr. Kahn left the May Unit, until March 24, 1975, when Dr. Seil became the inpatient director, Dr. Malamud was the acting interim director of the inpatient service at the May Unit. Dr. Malamud was board certified in psychiatry in 1964, and certified to practice psychoanalysis in 1969. Claims have been brought against him by Rubie Rogers, Willie Wadsworth, Able Bolden and Harold Warner.

BRIAN MAZMANIAN received his M.D. from St. Louis University in 1974. He was a resident on ward 4 at the May Unit from January, 1975 to July 30, 1975. A claim has been brought against him by Able Bolden.

MICHAEL OSBORNE received his M.D. from Michigan State University in 1972. He served as resident at the May Unit from July 1, 1974 to June 30, 1975. Claims have been brought against him by Rubie Rogers and Able Bolden.

SANFORD POMERANTZ received his M.D. from Boston University in 1973. From July 1, 1974 to January 6, 1975, he was a resident at the May Unit. A claim has been brought against him by Willie Wadsworth.

ELLIOT SCHILDKROUT received his M.D. from New York University in 1973. From January to July 1975, he served as a resident on ward A–3/A–4 of the Austin Unit. Claims have been brought against him by Donna Hunt, James Colleran and Elizabeth Bybel.

DAVID SEIL received his M.D. from Yale University in 1962. From January 1974 until March 1975 he was director of the Evaluation Service at the May Unit. He served for the next three years as director of inpatient services at the May Unit. A claim has been brought against him by Harold Warner.

ALLAN SIEGEL received a doctorate in counseling from Boston University. Dr. Siegel served as supervisor of ward 3 in the May Unit from June 1974 to June 1976. He is a licensed psychologist. A claim has been brought against him by Willie Wadsworth.

JOHN SZLYK received his M.D. from Tufts University. From July to December 1974, he served as a resident at the Austin Unit on ward A–4. A claim has been brought against him by Donna Hunt.

JEAN TURNQUEST received her M.D. from Aberdeen University in 1971. From July 1, 1974 to January 5, 1975, she was a resident on ward 3 of the May Unit. A claim against her has been brought by Willie Wadsworth.

IV. *BOSTON STATE HOSPITAL FACILITIES AND PERSONNEL*

Boston State Hospital is a multi-unit campus type facility located in the Dorchester section of Boston. From 1973 to 1975,

Austin and May were two of these units. By the end of 1975, Austin was affiliated solely with Tufts Bay Cove Mental Health Center, while May became part of the Solomon Carter Fuller Mental Health Center.

The May Unit was a teaching facility utilized by the Boston University Medical School. Austin had a comparable affiliation with Tufts. Both served as state hospitals for mentally ill adults, age 16 and over. The population of each is determined by the residence of the patient. The Commonwealth is divided into mental health regions which, in turn, are subdivided into "catchment areas." Absent special circumstances, patients may receive treatment only in the catchment area that includes their residence. The catchment area served by Austin consisted of South Boston and parts of Chinatown and North Dorchester. The catchment area for the May Unit consisted of parts of Back Bay, the South End, most of Roxbury, and parts of Dorchester.

A. *The Austin Unit*

Austin was built in 1918–20 as a maximum security ward for 160 female patients. It is a drab, gloomy, poorly lighted structure in a state of chronic disrepair. Poor lighting restricted evening recreational opportunities. Plumbing problems were constant, often resulting in basement flooding and the odor of sewage through the building. As of January 1975, wards A–3 and A–4 were on the second floor while A–6 was on the third floor. The ward staff of A–3 and A–4 was divided into three teams to handle the approximately 50 patient case load. The Austin Unit was moved to a new location in 1977. Its name was changed to the Johnson Unit.

Between January 1973 and April 1975, Austin's daily census averaged about 75 inpatients. Of the approximately 500 admissions per year, about 60% were re-admissions. As of 1974, the average length of hospital stay was 14 days, down from an average of 17 days in 1972. Between January 1974 and January 1975, there were approximately 35–45 patients per day on ward A–4, about half of whom were females.

Most of these were over 25 years old. At any given time, four or five might be under 20 years of age. There was rarely a patient under 16. Approximately 20 to 25% of the patient load were potentially violent, with about 3 to 5% actually engaging in violent behavior periodically.

From January 1973 to April 1975, the number of direct care staff at Austin averaged between 60–65. Twenty-three full-time nurses were on duty on three eight-hour shifts. Two physicians were assigned to each ward, as well as a staff psychiatrist, resident psychiatrist, at least two registered nurses, one social worker, a psychologist, a rehabilitation counselor, and mental health workers. A nurse would be present 90–95% of the daytime and a doctor was always available seven days a week. There was an average of four staff people for each ward during the evening shift and about three during the night shift. A "team system" of patient care was utilized. Each team was headed by a resident and included members of the various professional disciplines working within the hospital.

The defendant Dr. Gill was the Austin unit chief from January 1973 through January 1975. As such, he had overall responsibility and authority. In addition, he had primary psychiatric supervisory responsibility for ward A–6.

The defendant Dr. Kantar became responsible for the merged ward A–3 and A–4 and Dr. David Curtis took over responsibility for ward A–6 as of January 1975. Thereafter, Dr. Gill no longer had responsibility for any particular ward, but made building rounds three days a week. He did not attend daily ward rounds.

Dr. Kantar, the staff psychiatrist, supervised the psychiatric residents. These residents served for terms of six months. They included Dr. Press (not a defendant) from January 1974 until June 1974; the defendant Dr. Szlyk from July 1, 1974 until the end of December 1974; and the defendant Dr. Schildkrout from January 1973 until June 1975.

In the fall of 1974, Layne Erban became the director of nursing of the Austin Unit, and had administrative responsibility for the entire Austin nursing and attendants staff. Her responsibilities included scheduling, coverage and policy. In addition, she participated in the activities of the ward A-6 until its merger with A-3. Although Erban did not have line authority over residents, she was one of their prime sources of information with respect to practices and policies at Austin. If a resident should fail to follow those practices and policies, she would inform Dr. Kantar or Dr. Gill.

Each ward had a head nurse to whom responsibilities were delegated by Erban. Essentially, the head nurse was the ward administrator, particularly with respect to scheduling patient treatment and general implementation of policy. Dr. Gill had line authority over Layne Erban and each of the ward administrators after the fall of 1974. Prior to this time he did not have the power to hire or fire nurses.

B. *The May Unit*

The May Unit was in a three storied U-shaped building. Offices and meeting rooms were on the first floor. The wards were on the second and third floors, and had an inpatient capacity of about 90. Wards 3 and 4, prime subjects of this litigation, were on the second floor. Overall, the building was in chronic disrepair. The heating system was particularly unreliable.

The May staffing pattern was headed by a clinical director. Under him was the senior ward psychiatrist who, in turn, supervised the resident psychiatrists.

The nursing staff reported to the director through the nursing director. Subordinate to her were the ward head nurses who, in turn, supervised the ward LPNs. At the bottom of the totem pole were the mental health workers.

The director had overall responsibility for clinical and administrative management of the staff and plant. This responsibility included consultations with and supervision over the psychiatric and nursing staff, as well as the creation and implementation of treatment policies.

From 1970 through most of 1974, Dr. Kahn was director of the May Unit. In September 1974, the defendant Dr. Malamud became acting director until the defendant Dr. Seil assumed the post in March 1978.

Dr. Siegel, a psychologist, was in charge of ward 3. He had primary responsibility for the clinical activities on the ward. His position included the supervision of resident psychiatrists and consultation with staff and patients with respect to development of policies. He would also preside at weekly ward meetings. Although his primary responsibility involved ward 3, Dr. Siegel also served as a consultant to Drs. Mazmanian and Cacciola, the residents on ward 4, as well as the resident on ward 6, Dr. Holstein. Dr. Siegel supervised Drs. Pomerantz and Turnquest when they were ward 3 residents, as well as their replacements, Drs. Goodman and Goldberg. He also supervised two ward 4 psychologists. Dr. Siegel did not have supervisory responsibility for the nursing staff.

Each ward 3 resident was responsible for the medical and psychiatric care of approximately 10–12 patients. On ward 4, three teams functioned, two under direction of Drs. Cacciola and Mazmanian. The third was supervised by a social worker. The per resident patient load on ward 4 varied from a low of eight to a high of 15 during the first half of 1975. The May Unit daily census between January 1972 and September 1974 varied between 75 and 100 patients. From January to June 1975, the census averaged about 120 patients, approximately 25 of whom were on ward 3.

The typical day shift averaged three to five in staff, in addition to two or three doctors. There were slightly fewer staff on the evening and night shifts, although doctors were "on call" on a rotating basis. The average patient census was 21. Staff had a number of additional responsibilities that required their presence outside the ward.

As of late 1974, May was without a full time clinical director, and suffered a short-

age of full time senior staff direction in wards 3, 4, and 6. There were three head nurses for the entire Unit. The ward 3 day shift had to make do with a total of six to eight licensed practical nurses and attendants. On the second and third shifts, there were about four to six LPNs and attendants.

Each ward had two or three treatment teams. Typically, they would include resident psychiatrists, psychologists, nursing staff, social workers and the patients. The teams met twice a week to discuss details of particular patient treatment plans. Most treatment planning took place during the day shift. There were ward intershift meetings primarily involving the 7-to-3 and 3-to-11 shifts. The 11-to-7 and 7-to-3 shifts also met on the average of once a month.

A number of activity programs were available for patients at both Austin and May. Those available at Austin were art therapy, home care workshop, drama, exercise, plants, pottery, daily living, newspaper and sports. Among the activities available at May were ward meetings, team meetings, individual meetings between a patient and his or her administrator, occupational therapy, daily living, physical therapy, rehabilitation therapy, music, games and alcoholics meetings.

## V. PROCEDURES FOR COMMITMENT TO THE BOSTON STATE HOSPITAL

Standards for commitment to state-run mental institutions in Massachusetts are defined by statute. Most admissions fall under one of the following categories:

### A. Conditional Voluntary Admission

#### M.G.L.A. ch. 123, §§ 10, 11

Patients needing treatment for mental illness are encouraged to volunteer for commitment. Application may be made by a parent or guardian, although their approval is unnecessary if the applicant is 16 years or older. The hospital may be inspected by the prospective voluntary applicant prior to admission. The voluntary patient may be discharged upon request, after giving three days notice to institution authorities.

### B. Involuntary Temporary Hospitalization for 10 Days

#### M.G.L.A. ch. 123, § 12

An involuntary 10 day commitment of a person may be obtained upon a physician's statement that, absent hospitalization, a likelihood of serious harm exists due to mental illness. After admission, the patient is examined for 10 days to determine whether failure to hospitalize the patient further would create a likelihood of serious harm due to mental illness. If such a likelihood exists, the hospital may petition the court for civil commitment.

### C. Involuntary Prolonged Civil Commitment

#### M.G.L.A. ch. 123, §§ 7, 8

If the hospital administrator determines that continued hospitalization of a patient is necessary because a likelihood exists of serious harm due to mental illness, he may petition the court for the patient's commitment. The court will notify the patient and the patient's nearest relative or guardian who will have the opportunity to request a hearing. The court may order the patient committed for a period of up to one year.

### D. Commitment of Alleged Alcoholics

#### M.G.L.A. ch. 123, § 35

A police officer or a physician may petition any district court for commitment of a person deemed to be an alcoholic. If the court finds there is a likelihood of serious harm because of alcoholism, that person may be ordered committed for up to 15 days.

### E. Admission and Retention of the Mentally Retarded

All admissions of the mentally retarded are voluntary unless the hospital determines that the retarded person is also mentally ill and that release would create a likelihood of serious harm. In such a case, the patient would be required to submit a

three day notice of intention to leave and the hospital administrator could petition the court for permission to retain custody.

## VI. *DEPARTMENT OF MENTAL HEALTH REGULATIONS CONCERNING TREATMENT AT BOSTON STATE HOSPITAL*

█ Commitment to Boston State, even on an involuntary basis, is not an adjudication of incompetence. Department of Mental Health (D.M.H.) Regulation § 221.02 states:

> *Civil Rights.* No person shall be deprived of the right to manage his affairs, to contract, to hold professional, occupational or vehicle operator's licenses, to make a will, to marry, to hold or convey property, or to vote in local, state, or federal elections solely by reason of his admission or commitment to a facility except where there has been an adjudication that such person is incompetent, or when a conservator or guardian has been appointed for such person. In the event of conservatorship, a patient's civil rights may be limited only to the extent of the conservator's adjudicated responsibility.

The substance of this section has been codified in M.G.L.A. ch. 123, § 25.

█ A committed patient has the right to receive "treatment suited to his needs which shall be administered skillfully, safely, and humanely with full respect to his dignity and personal integrity." D.M.H. Reg. § 221.03. D.M.H. regulations also provide that a committed person

> shall receive treatment and rehabilitation in accordance with accepted therapeutic practice, including oral, subcutaneous and intramuscular medication when appropriate and when ordered by a physician. However, electroconvulsive treatment and lobotomy shall require separate consent by the patient pursuant to M.G.L.A. ch. 123, § 23.

D.M.H. Reg. § 220.02. Another D.M.H. regulation requires that

> [e]ach facility under the supervision and control of the Department or licensed by the Department shall post a copy of the rights articulated in this regulation in the admission room of the facility in each residential unit or any other appropriate places in the facility.

D.M.H. Reg.M.H.16–7. In accordance with that requirement, a statement of patients' civil rights was posted on the wards of the May and Austin Units, and was included in a packet of information presented patients on admission. The poster stated:

> ### Your Rights
>
> You Have The Right To Be Treated With Dignity And Respect
> You Have the Right to Privacy
> TREATMENT RIGHTS:
> You have the right to:
> —be told in detail what is wrong with you, what alternative treatments are available, and to choose from these alternatives.
> —be informed of the risks and possible side effects of treatment, and to refuse treatment at any point.
> Restraints and Seclusion: You may be restrained only in case of emergency. Such restraints or seclusion must be justified in your record, and must be reviewed by the superintendent within 8 hours.

The admission packet stated:

> *PROCEDURES FOLLOWING ADMISSION:*
> A course of treatment may include counselling, medications, electroconvulsive treatment, and treatment of any medical condition that the patient may be found to have.
> No medical or surgical treatments including electroconvulsive treatment are given without the consent of the patient.

## VII. *ANTI–PSYCHOTIC DRUGS*

The plaintiffs' principal objection to forced medication is the potential for antipsychotic drugs to cause certain adverse side effects. Because of that adverse potential, plaintiffs maintain that the decision whether to reject or accept medication in a non-emergency situation should rest with the patient.

Anti-psychotic drugs are chemical agents used to manage and treat serious mental illness. They are also referred to as neuroleptic drugs and psychotropic drugs. The drugs that the plaintiffs received included Thorazine, Mellaril, Prolixin and Haldol. In general, the drugs influence chemical transmissions to the brain, affecting both activatory and inhibitory functions. Because the drugs' purpose is to reduce the level of psychotic thinking, it is virtually undisputed that they are mind-altering.

Foremost among the possible side effects of anti-psychotic drugs is tardive dyskinesia. Tardive dyskinesia is a neurological side effect which may appear after prolonged use of anti-psychotic drug treatment. The disease is the outcome of a complex patient-drug interaction which is not currently well understood.[5] The overt symptoms of tardive dyskinesia include certain involuntary motor movements, particularly of the face, lips, and tongue. Tardive dyskinesia can also cause the involuntary movement of fingers, hands, legs and the pelvic area. In its most progressive state, the disease can interfere with swallowing and can affect all motor activity. While in mild cases the disease can simply be a source of embarrassment, it can be physically and psychologically disabling.[6] Until very recently, tardive dyskinesia was considered irreversible. Some studies now suggest that in certain cases it can be effectively treated.[7]

Recent studies also suggest that tardive dyskinesia is more widespread in mental patients than previously considered. Two studies now place the prevalence of tardive dyskinesia among chronically hospitalized schizophrenics at 50% and 56%. With respect to outpatients, one survey has report-

ed a prevalence rate of 41%.[8] Although this court is unpersuaded that any of the named plaintiffs suffered from tardive dyskinesia, see Sec. XI (A) *infra*, several of the defendants have admitted that other patients at Boston State suffered from the disease.

There are also a variety of neurological side effects of anti-psychotic drugs, known as extrapyramidal effects. These include akathisia (motor restlessness—the inability to sit still), akanesia (physical immobility and lack of spontaneity), dystonia (spasmodic muscle reaction frequently characterized by a twisting of the neck) and pseudoparkinsonian syndrome (mask-like face, rigidity of the hand). These conditions are not considered to be irreversible.

## VIII. THE INJUNCTION CLAIM AGAINST MEDICATION PRACTICES

Plaintiffs allege that the defendants have impermissibly followed a policy of forcibly medicating committed mental patients, and that such policy has denied them their constitutionally protected right to refuse treatment.[9] Although plaintiffs urge this court to recognize a right to refuse treatment, they do not maintain that such a right is absolute. They acknowledge that in emergencies it must yield to the state's interest in medicating.

Defendants proffer a three-pronged defense to plaintiffs' allegations. First, they maintain that a committed mental patient is *per se* incompetent to decide whether or not to receive treatment. Second, they deny that any patient was forcibly medicated except in circumstances amounting to at least a psychiatric emergency. Third, they

---

**5.** Sovner, DiMascio, Berkowitz, and Randolph, "Tardive Dyskinesia and Informed Consent," *Psychosomatics*, March, 1978 at 177.

**6.** *Id.* at 173.

**7.** *Id.*

**8.** *Id.* Another author has put the incidence of tardive dyskinesia at 30 to 50 per cent of patients who have been treated with drugs for several years. G. Crane, "Two Decades of Psychopharmacology and Community Mental

Health: Old and New Problems of the Schizophrenic Patient," *Transactions of the New York Academy of Sciences*, November, 1974.

**9.** Plaintiffs theorize their right to refuse treatment from the provisions of the First, Fourth, Fifth, Eighth and Ninth Amendments, as guaranteed to them by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

assert that committed mental patients, whether voluntary or involuntary, have no constitutional right to refuse treatment in any situation—emergency or non-emergency.

The respective positions of the parties set up the fundamental issue as to when, if ever, an institutionalized mental patient may be forcibly medicated [10] in non-emergencies. Prior to discussing the legal question of whether there exists a fundamental right to refuse psychotropic medication, it is necessary to consider certain threshold issues.

### A. The Competency of Mental Patients to Refuse Treatment

A pivotal issue dividing the parties in this case is the competency of mental patients to decide rationally whether or not to receive treatment. At final argument, defendants took the flat position that, once admitted to a mental institution, a patient is deemed incompetent to decide whether or what to accept by way of treatment in either an emergency or non-emergency situation. And in their Trial Brief, defendants asserted that

> [t]he Commonwealth is not seeking to forcibly or involuntarily medicate patients *competent to decide for themselves.* (Defendants' Trial Brief p. 27) (emphasis supplied).

Hence, defendants argue that plaintiffs as incompetents cannot assert any constitutional right to refuse treatment. Basically, defendants theorize that,

> once an individual becomes incompetent, the state must act as *parens patriae.* As such, it has the duty and the right to care for the 'best interest' of the incompetent, even if that occasionally means overriding a decision made by the individual while incompetent.

**10.** This term includes forced medication by injection, and the threat thereof, upon a refusal to take medication orally.

**11.** Plaintiffs rely on M.G.L.A. ch. 123, § 25 and D.M.H. Reg. § 221.02. *See* Sec. VI *supra.*

*In re Boyd,* 403 A.2d 744, 748 n. 8 (D.C.App. 1979) (citations omitted).

Plaintiffs disagree. They argue that, as a matter of state law, mental patients are presumed competent to manage their affairs,[11] and that such presumption must be deemed to include competence to make treatment decisions.

The weight of evidence persuades this court that, although committed mental patients do suffer at least some impairment of their relationship to reality, most are able to appreciate the benefits, risks, and discomfort that may reasonably be expected from receiving psychotropic medication. This is particularly true for patients who have experienced such medication and, therefore, have some basis for assessing comparative advantages and disadvantages. Indeed, a fundamental concept for treating the mentally ill is the establishment of a therapeutic alliance between psychiatrist and patient. Implicit in such an alliance is an understanding and acceptance by the patient of a prescribed treatment program.

■ Moreover, defendants' position that commitment *per se* demonstrates the incompetence of a mental patient to decide treatment questions is at odds with M.G. L.A. ch. 123, § 25 and D.M.H. Reg. § 221.02. These provisions state unequivocally that, although committed, a mental patient is nonetheless presumed competent to manage his affairs, dispose of property, carry on a licensed profession, and even to vote. That presumption of competency prevails unless and until there has been an adjudication of incompetency by a court, following notice and hearing. D.M.H. Reg. §§ 221.06, 222.-05.[12]

■ To be sure, these regulatory provisions do not expressly grant mental patients a right to refuse treatment, except with

**12.** At final oral argument, defendants took the position that, although a committed mental patient would be presumed competent to deed his home to his doctor, he would not be presumed competent to decide whether to follow that doctor's advice concerning taking of medication. Such an argument would make a doubter of even the most credulous.

respect to electrical shock and lobotomy. But, M.G.L.A. ch. 123, § 25 and related D.M.H. regulations do recognize in absolute terms the competence of committed persons to manage their affairs and participate in a variety of challenging activities. That recognition tilts the scales in favor of presuming, as well, the competence of a committed mental patient to make treatment decisions, absent an adjudication to the contrary.[13]

### B. Guardianship

The D.M.H. regulations provide that a patient's competence may be called into question. Indeed, they impose an obligation upon the institution to review periodically a patient's competence to "manage rationally the ordinary affairs of life," D.M.H. Reg. § 222.05, and to seek the court appointment of a guardian if the competence of a patient is in doubt.

Assuming an adjudication of incompetence is made, a guardian would be appointed to manage the patient's affairs. Plaintiffs contend that the guardian could make medication decisions on behalf of the incompetent patient in nonemergencies, thereby serving the Commonwealth's *parens patriae* interest in treating the patient. Given an emergency, plaintiffs concede that the Commonwealth would have a right to forcibly medicate any committed patient, competent or otherwise. Thus, plaintiffs contend that the Commonwealth's interest in preserving order and safety at the Hospital is adequately served as well.

The defendants have both legal and factual objections to the reliance on guardians in the treatment process. First, defendants contend that, even assuming committed patients have a right to refuse treatment, such right would be "personal" and not within the representative powers of even a judicially appointed guardian. Second, they contend that the guardianship scheme has proved impracticable.

■ In support of their legal theory, defendants cite the following passage from *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972):

If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. (Emphasis in original).

The defendants, however, miss the import of the court's admonition. The key to the *Eisenstadt* quote is that the right of privacy means the right of individuals to be free from unwarranted governmental intrusion in fundamental personal matters. The fact that a court appointed guardian may have to act to protect the patient in no way abrogates his basic right to be free from unwarranted government intrusion. To decide otherwise would make defenseless not only judicially declared incompetents, but small children whose interests traditionally have been represented and protected by parents and guardians. Defendants' theory would essentially require such persons to fend for themselves.[14]

In making medication decisions, a guardian would not act as a third person, but would merely stand and act in the place of the patient. The patient's right is not to get a guardian. It is to be free from unwarranted government intrusion. The guardian is merely a means for protecting that freedom.

Distinguishable as well is *Parham v. J.L. and J.R.*, —— U.S. ——, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), where the Supreme Court sustained the validity of Georgia's commitment procedures for minors. While

---

**13.** Added support for this argument is the D.M.H. authorized poster on the walls of the Austin and May wards stating that patients have the right "to refuse treatment at any point." *Supra* p. 1359.

**14.** The danger, if not illogic, of the defendants' position becomes clear when extended to the possible circumstance of an involuntary, but presumably competent, patient becoming impregnated while confined. The defendants' position would permit the institution alone to decide whether the patient would give birth or abort. Such a position would clearly be *contra* to the teaching of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

it is true that the Court rejected the argument that a neutral person must decide whether or not a child should be committed to a mental hospital, it in no way suggested that the commitment decision could be made *solely* by the physician. There, the decision to commit was based on the collective opinion of physician and parents. Here, the appointment of a guardian would fulfill the parent's responsibility recognized in *Parham.*

Most of the defendants' factual contentions concerning the impracticality of utilizing guardians in the treatment process relate to the manner in which guardians are appointed. These contentions actually amount to little more than complaints concerning the effectiveness of a procedural framework designed and implemented by the Commonwealth.

The presumption that an involuntary mental patient is competent to handle his affairs is not a matter of judicial decree. Rather, it is a statutory presumption created by the Massachusetts legislature, as is the procedure for challenging that presumption in the courts. If that statutory scheme is burdensome, redress and relief should be sought from the legislature.

Similarly, defendants' complaint that guardianship applications are unduly delayed in the state court is a matter within the Supreme Judicial Court's general powers of superintendence and should be brought to that court's attention.[15] The same may be said for any complaint as to the ability or integrity of the potential guardian appointment pool. Moreover, defendants' assertion that court appointed guardians are "unsuited for making decisions regarding whether medication should be imposed on a patient" (Defendants' Trial Brief p. 43) is presumptuous and inconsistent with the increasingly accepted doctrine of informed consent which recognizes that

lay persons are presumed to have the capacity to make treatment decisions.[16]

Also to be borne in mind is that juries and judges, traditionally non-medical persons, are routinely called upon to pass judgment in medical malpractice cases. Indeed, the Commonwealth's statutory procedure for screening such cases provides for an examining panel of three persons, two of whom may be non-physicians.[17]

Without merit, as well, is defendants' contention that hospital staff would be required to "run back and forth to the courts every time a patient's condition improves or deteriorates." (Defendants' Trial Brief p. 43). Once a guardian is appointed, no further court appearances would be required. Of course, it might be necessary for the hospital staff to maintain a line of communication with the guardian. To do so, however, would impose no greater burden than that assumed anyway by most responsible doctors who routinely consult with parents and family members, in non-emergencies, with respect to a patient's condition and course of treatment.

This court is similarly unpersuaded by defendants' pleas as to the anti-therapeutic effects of appointing a guardian. Certainly, labeling a person as incompetent has a profound effect on his life, and may well have some impact on that person's self-respect. But, we are not considering that phenomenon in isolation. We are dealing with the relative well-being of a patient who has already suffered the trauma of being confined to an institution and is now facing the experience of being forcibly disrobed and then injected with psychotropic medication against his will. Balancing all the circumstances, it is difficult to see how the incompetent mental inpatient would be damaged by having a guardian appointed to ensure against any unwarranted intrusion into his life.

---

**15.** In any event, defendants concede that there is statutory authority for "immediate appointment" in emergency situations. M.G.L.A. ch. 201, § 14.

**16.** For example, a patient's Bill of Rights was recently implemented in this Commonwealth, a

cornerstone of which requires a patient's informed consent prior to treatment. M.G.L.A. ch. 111, § 70E (*1*), Acts of 1979, ch. 214.

**17.** M.G.L.A. ch. 231, § 60B.

 This court concludes, · therefore, that committed mental patients are presumed competent to make decisions with respect to their treatment in non-emergencies. Given an adjudication of incompetence, a guardian may exercise for and on behalf of a committed mental patient any rights he may have to make treatment decisions in a non-emergency.[18]

## C. The Right to Refuse Treatment in an Emergency

As was noted at the outset of this opinion, the parties agree that forced medication is permissible in an emergency situation. They disagree, however, as to what circumstances amount to an emergency situation justifying such treatment.

Plaintiffs urge this court to define an emergency justifying forced medication as one in which there exists a substantial likelihood of personal injury to the subject patient, other patients or staff members. Plaintiffs recognize that medicine is an inexact science in which prognoses cannot be made with mathematical certainty. But, plaintiffs say that the threat of physical harm must, at the least, be more likely than not before there may be forced medication. Such a standard amounts to an expression of "probability," long a common bench mark for the admissibility of expert testimony concerning medical issues. Basically, the plaintiffs urge that emergency standards that control the imposition of seclusion[19] be applied as well to the issue of forced medication.

Defendants disagree, arguing that seclusion is a restraint while medication, forced or voluntary, is treatment. It would be inappropriate, defendants maintain, to impose on a treatment situation the strict standards for applying restraints. Instead, the defendants urge this court to recognize a broader definition of emergency—a so called "psychiatric emergency." Under defendants' theory, a psychiatric emergency justifying forced medication would exist given any of the following situations: 1) suicidal behavior, whether seriously meant or a gesture, 2) assaultiveness, 3) property destruction, 4) extreme anxiety and panic, 5) bizarre behavior, 6) acute or chronic emotional disturbance having the potential to seriously interfere with the patient's ability to function on a daily basis, 7) the necessity for immediate medical response in order to prevent or decrease the likelihood of further severe suffering or the rapid worsening of the patient's clinical state.

Although the defendants maintain that none of the named plaintiffs was forcibly medicated except when there was a serious threat of personal injury (the seclusion standard), they do admit that other class plaintiffs at Boston State have been forcibly medicated in circumstances that would not have justified the use of seclusion. (Defendants' Trial Brief pp. 14–15). But, defendants insist that any forced medication occurred only in circumstances that would fall within their proffered definition of a psychiatric emergency. Basically, the defendants say that no patient at Boston State was ever forcibly medicated except when there was a sincere belief by defendants that such treatment was necessary to the patient's recovery, or to provide urgently needed protection to that patient or others.

 The court recognizes that varying degrees of crisis may typify the average day on a ward of any mental institution. Patient behavior can be challenging, to say the least. Attendant staff must respond to such behavior in a manner that is appropri- ·

---

**18.** A recent California case supports the proposition that a guardian may exercise the patient's right to refuse medication. *In re Young*, 48 U.S.L.W. 2238 (Calif. Superior Court, Orange County, decided September 11, 1979) (on the basis of fundamental right to refuse medication, conservator has the right to obtain court-ordered termination of breathing device for comatose patient).

**19.** M.G.L.A. ch. 123, § 21 provides, in pertinent part, that restraint may be used only in "cases of emergency such as the occurrence of, or serious threat of, extreme violence, personal injury, or attempted suicide . . . ." M.G.L.A. ch. 123, § 1 defines restraint as including "confinement in a place of seclusion."

ate, reasonable and adequate. Given circumstances creating a substantial likelihood of physical harm to the patient or others, the Commonwealth, acting through hospital staff, may respond so as to ensure safety in the hospital community. The state's *parens patriae* interest in protecting the safety of the people extends to the microcosm world of the hospital, as well as the community at large.

■ But, defendants' proffered definition of an emergency justifying forced medication—the psychiatric emergency concept—is too broad, subjective and unwieldy. The fact that a set of circumstances may fall within the broad parameters of a psychiatric emergency does not necessarily justify any and all responsive steps taken thereafter by a doctor, even though therapeutic and well within the standards of reasonable medical practice.

■ This court holds, therefore, that a committed mental patient may be forcibly medicated in an emergency situation in which a failure to do so would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution.

**D.** *The Right to Refuse Treatment in a Non-Emergency*

Given the uncontested right of the state to impose treatment without informed consent in an emergency, the court must now decide whether the state has a comparable right in a non-emergency. Because the state contends that the status of voluntary and involuntary patients is substantively different, their rights will be considered separately.

**1.** *The Involuntary Patient's Right to Refuse Treatment*

■ As a matter of focus, it is important to bear in mind that in this case we are

dealing with a hospital setting, not a jail. But, a mental hospital is unique in that its patient community is composed primarily of seriously disturbed persons, many of whom have the potential for dangerous behavior. And so whatever rights a patient may have in such a setting must be balanced with the needs and exigencies of the hospital community as a whole. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The prime purpose of any hospital is to treat. Boston State is no exception. In the case of an involuntarily committed patient, Boston State has a duty to provide treatment. Stated another way, the involuntarily committed patient has a right to receive treatment. The question here is whether the hospital's duty to provide necessary treatment carries with it an implicit right to impose such treatment contrary to a patient's expressed wishes. In considering this question, it is important to have in mind that plaintiffs do not assert a right to refuse all treatment at all times. Their prime contention is that committed patients have a right not to be forcibly injected with psychotropic medication in a non-emergency situation, or where there are less drastic or less invasive alternatives available.

**a.** *The Involuntary Patient's Right to Privacy*

This court has already found that psychotropic medications are powerful and potentially mind-altering drugs. *See* Sec. VII *supra.* Plaintiffs argue that the forcible injection, without informed consent, of such medication violates a patient's constitutional right to privacy. They point out that the right of privacy has been broadly interpreted and applied in such diverse areas as marital relations,[20] contraception,[21] child rearing,[22] possession of obscene material in the home,[23] and bodily integrity.[24]

---

**20.** *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

**21.** *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

**22.** *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

**23.** *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

**24.** *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

Moreover, the Massachusetts Supreme Judicial Court has recognized that "in appropriate circumstances" a patient's constitutional rights may include "the right of a patient to preserve his or her right to privacy against unwanted infringements of bodily integrity . . . ." *Superintendent of Belchertown v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 424 (1977). Significant to the issue here is that court's comment:

> The constitutional right to privacy . . . is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. *The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice.*

370 N.E.2d at 426 (emphasis supplied).[25]

The defendants concede that a right to privacy may include "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). (Defendants' Trial Brief p. 25). But, they argue that plaintiffs' interest in refusing treatment in a mental institution setting is not a right fundamental to concepts of ordered liberty traditionally recognized and protected by the Supreme Court.[26]

The defendants' position does not give due regard to the plight of a patient who has been committed to a state mental institution. We know that the committed mental patient has been quarantined from home, family and society, not for adjudged criminal activity, but because of sickness—mental illness.

The committed patient is in a foreign setting. He is in need of treatment, yet is presumed to be competent. Absent a successful petition by the hospital superintendent to establish a guardianship, we must assume that the hospital regards the patient as competent to manage his affairs.[27]

■■■ At final argument, the Commonwealth conceded that a committed patient would have the right to sell his home, but maintained that the patient has no rights with respect to what treatment to receive, if any, in a non-emergency situation. Common sense dictates a contrary conclusion, however. Certainly the right to dispose of one's property, and the corollary right to protect and hold such property, are fundamental to any concept of ordered liberty. *See Lynch v. Household Finance Corp.*, 405 U.S. 538, 552, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). But, such rights pale in comparison to the intimate decision as to whether to accept or refuse psychotropic medication—medication that may or may not make the patient better, and that may or may not cause unpleasant and unwanted side effects. The right to make such a decision is basic to any right of privacy.

b. *The Involuntary Patient's First Amendment Rights*

The concept of a right of privacy also embodies First Amendment concerns.[28] It is clear from the evidence in this case that psychotropic medication has the potential to affect and change a patient's mood, attitude and capacity to think. Such effects may well be considered by the medical profession as positive steps on the road to

---

**25.** The root premise is the concept, fundamental in American jurisprudence, that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 271, 464 F.2d 772, 780 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

**26.** *Roe v. Wade, supra*, 410 U.S. at 152, 93 S.Ct. 705.

**27.** D.M.H. Reg. § 221.02 presumes the competency of a committed person to manage his affairs, unless there has been an adjudication of incompetency. *See* Sec. VIII(A) *supra* and D.M.H. Treatment Regulations, Sec. VI *supra*.

**28.** "In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment . . . ." *Roe v. Wade, supra*, 410 U.S. at 152, 93 S.Ct. at 726.

recovery and eventual release from the hospital. But, the validity of psychotropic drugs as a reasonable course of medical treatment is not the core issue here. At stake is the more fundamental question as to whether the state may impose once again on the privacy of a person, already deprived of freedom through commitment, by forcibly injecting mind-altering drugs into his system in a non-emergency situation.

The right to produce a thought—or refuse to do so—is as important as the right protected in *Roe v. Wade* to give birth or abort. Implicit in an individual's right to choose either abortion or birth is an underlying right to think and decide. Without the capacity to think, we merely exist, not function. Realistically, the capacity to think and decide is a fundamental element of freedom.

■■■■■ The First Amendment protects the communication of ideas. That protected right of communication presupposes a capacity to produce ideas. As a practical matter, therefore, the power to produce ideas is fundamental to our cherished right to communicate and is entitled to comparable constitutional protection. Whatever powers the Constitution has granted our government, involuntary mind control is not one of them, absent extraordinary circumstances. The fact that mind control takes place in a mental institution in the form of medically sound treatment of mental disease is not, itself, an extraordinary circumstance warranting an unsanctioned intrusion on the integrity of a human being. The patient is in an institution only because he is unable to function safely in society, and so there is a public interest in civil commitment. The state may not involun-

tarily commit a person merely because of bizarre or unorthodox behavior.[29]

■■■ The concept of a therapeutic alliance between doctor and patient presumes a communication of information as to the pros and cons of a particular treatment program. The committed patient has a right to be wrong in his analysis of that information—a right to be unwise—as long as the consequences of such error do not pose a danger of physical harm to himself, fellow patients or hospital staff. And so, while the state may have an obligation to make treatment available, and a legitimate interest in providing such treatment, a competent patient has a fundamental right to decide to be left alone, absent an emergency situation.[30]

### 2. The Voluntary Patient's Right to Refuse Treatment

Defendants argue that voluntary patients may not refuse medication, even in non-emergencies, and still remain at the Hospital. Their position is that patients volunteering for commitment implicitly agree to accept the Hospital's treatment program and may not second-guess the institution staff by picking and choosing the type of medication to be used. Basically, the defendants argue a contract theory that would supersede and amount to a waiver of any supposed right of refusal.

All voluntary patients sign an application that states:

"I understand that during my hospitalization and any after care, I will be given care and treatment which may include the injection of medicines."

Four of the named plaintiffs (Bybel, Hunt, Rogers, and Warner) were, at times, volun-

---

**29.** *See O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975) (state may not "fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different").

**30.** As Justice Brandeis stated in his seminal dissent in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928):
The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance

of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

tary patients and so probably signed such a form. Presumably, they and other voluntary patients were competent to make the commitment decision—or someone was authorized to make that decision on their behalf. *See* Sec. VIII (A) *supra.*

■ Clearly, parties competent to contract may not accept provisions of the bargain they favor and then reject those they wish to avoid. But, such a truth serves only to raise the question presented here, not answer it. One remedy for the unhappy voluntary patient is clear, leaving the hospital. But procedures for doing so require a hiatus of three days' notice from the patient to the hospital superintendent. *See* Sec. V *supra.* The issue, therefore, is really twofold: 1) what is the voluntary patient's right to refuse treatment from the time of such notice to the time of departure from the hospital, and 2) even prior to notice, or absent notice, does the voluntary patient have a constitutional right to refuse treatment despite any contractual obligation that may have been established by the voluntary commitment?

■ This court holds that the voluntary patient has the same right to refuse treatment in a non-emergency as does the involuntary patient,[31] and that on the facts of this case there has been no waiver of such right.

To support its waiver theory, the Commonwealth cites the Massachusetts case of *Belger v. Arnot,* 344 Mass. 679, 183 N.E.2d 866 (1962). In *Belger,* plaintiff claimed that certain involuntary electroshock treatments she received while hospitalized, pursuant to a temporary ten day admission, amounted to a battery. While there is language in the opinion which suggested that defendants were not liable because plaintiff had assented to all subsequent treatment, that case is inapposite to the one at bar.

First, the general issue before the *Belger* court was one of liability in tort, not the issuance of an injunction to protect constitutional rights. Second, the language here constituting application for voluntary commitment is neither a clear consent to be treated or a knowing voluntary waiver of a constitutional right to refuse treatment. At best, the language is ambiguous and could even be interpreted as a mere statement of expectation or entitlement by the patient.

■ In order for a court to find a waiver of a right to refuse, the evidence must be clear that the patient understood such a right existed and then elected knowingly and voluntarily to waive such a right.[32] The language proffered by the defendants contains neither element.[33] The Commonwealth drafted the language in the application and the defendants, as agents of the Commonwealth, must bear the burden of its inadequacy.[34]

### E. *The Commonwealth's Interests*

■ The Supreme Court has long recognized that fundamental rights are not absolute, but may be subordinated to compelling state interests. *Roe v. Wade, supra,* 410 U.S. at 155, 93 S.Ct. 705. The state has no such compelling interest here.

■ Each of us has a basic right to care for our bodies subject to "reasonable regulations, as the safety of the general public may demand." *Jacobson v. Massachusetts,* 197 U.S. 11, 29, 25 S.Ct. 358, 862, 49 L.Ed. 643 (1905). Here, the state's interest in protecting the safety of the general public is the justification for commitment of mental patients. After commitment, the balancing of state versus patients' interests must be done in the context of the community setting.

---

**31.** A patient's commitment status may be changed from voluntary to involuntary upon proper notice and hearing. *See* discussion of commitment procedures, Sec. V *supra.*

**32.** *See generally Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (requirement that a person knowingly waive constitutional rights for waiver to be effective).

**33.** *See* application language, p. 1367 *supra.*

**34.** That the wording of the application was intended to serve as a waiver is borderline fatuous in view of the Commonwealth's historic position that no committed mental patient has a right to refuse treatment.

■ That the state may forcibly medicate a committed patient given an emergency that threatens the physical safety of patients and staff—the institutional community—is not at issue. Such action is necessary to protect the members of that community and is consistent with the basic rationale relied on in *Jacobson*. Given a non-emergency, however, it is an unreasonable invasion of privacy, and an affront to basic concepts of human dignity, to permit forced injection of a mind-altering drug into the buttocks of a competent patient unwilling to give informed consent. That type of treatment is not necessary to protect the general public, since the patient has already been quarantined by commitment. Of course, there being no emergency, the hospital community is in no danger.

■ The only purpose, therefore, of forced medication, in a non-emergency, is to help the patient. The desire to help the patient is a laudable if not noble goal. But, a basic premise of the right to privacy is the freedom to decide whether we want to be helped, or whether we want to be left alone. It takes a grave set of circumstances to abrogate that right. That a non-emergency injection in the buttocks may be therapeutic does not constitute such a circumstance.

Fourth Amendment cases cited by the defendants to support a state interest in forced medication are inapposite.[35] The patients at Boston State are not subjects of criminal investigation, but are victims of fate who have been shortchanged by life. They have been isolated to protect the public, even though they are presumed to be competent to manage their affairs.

■ There are alternative methods of treating mental patients, though some may be slower and less effective than psychotropic medication. As has been noted,

plaintiffs' primary objection is to the forced injection of psychotropic medication. Given the alternatives available in non-emergencies, subjecting a patient to the humiliation of being disrobed and then injected with drugs powerful enough to immobilize both body and mind is totally unreasonable by any standard. Forced injections in non-emergencies are classic "intrusions which are not justified in the circumstances." *Schmerber v. California*, 384 U.S. 757, 768, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966).

Aside from the proffered state interests in forced medication, the defendants also resist recognizing a right to refuse by challenging the efficacy of a regime of informed consent. The defendants' crystal ball foretells a tale of gloom if the standards imposed by this court's temporary restraining order (TRO) are made permanent. But, their prediction is not borne out by the experience of that order. Although Dr. Gill expressed concern as to the impact of the TRO on effective treatment, he could identify only 12 patients out of 1,000 who refused their medication for prolonged periods between May 1, 1975 and June 23, 1977 —and most of those changed their minds within a few days. None of these patients was transferred to a more secure institutional setting because of behavior problems.[36]

Should the TRO be made permanent, defendants foresee institutional settings becoming mere warehouses, characterized by increases in violence, patient apathy, length of stays and administrative problems. The evidence in this case, however, demonstrates that such a gloomy forecast is more dramatic than factual.

As has been pointed out, the target of plaintiffs' suit is forced injection of psycho-

---

**35.** *See, e. g., Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).

**36.** In at least one instance of violence by a patient who refused treatment, Dr. Gill acknowledged at trial that the signs of likely physical harm, absent forced medication, were present and the consequences predictable. Forced medication would, therefore, have been permissible under the provisions of the TRO.

The subsequent violence in that situation was, therefore, not a function of the TRO, but was due to the staff's failure to act in accordance with its professional judgment. Doctors, like judges, are in a decision making profession. Some decisions are clear and others less certain. Neither profession has room for those unwilling or unable to make the tough ones.

tropic medication. Given a patient's refusal, other traditional means of psychotherapy and treatment would continue to be available. The fact that some doctors may feel that the use of psychotropic drugs is quicker and more effective than other available treatment does not mean that patients should not be given the option to follow a more conservative course in a non-emergency setting. Also to be borne in mind is that the great majority of patients have not declined their psychotropic medication during the pendency of the TRO. Most of those who did changed their minds within a few days. This speaks well for the confidence in a doctor's judgment that may be established given the effort to establish a strong therapeutic alliance.

The First Circuit recognizes an involuntary patient's right to be secure from the assaults of fellow patients, *Harper v. Cserr,* 544 F.2d 1121 (1st Cir. 1976), and the state's power "to establish reasonable involuntary psychiatric procedures to deal with highly disturbed persons having manifestly dangerous propensities." *Gomes v. Gaughan,* 471 F.2d 794, 800 (1st Cir. 1973). Those propositions are not in dispute here, and this court's TRO in no way impinged on the state's power to act in such situations. In this regard, it is significant to recall the testimony of Dr. Gill to the effect that only 3% to 5% of the Austin Unit's patients engaged in violent behavior, and only 20 to 25% of that population were even potentially violent.

In determining whether to order permanent injunctive relief, the issue before this court is not whether forced injection of psychotropic medication may be considered sound medical practice. Plaintiffs' constitutional challenge raises the issues as to whether a patient may decline medication even though it may be beneficial, and whether that declination must be respected by hospital staff.

 In an *amicus* brief, the Massachusetts Psychiatric Society argues:

If forbidden to use certain standard, effective modalities, they (hospital staffs) will be caught in the situation of having a legal obligation which they cannot carry out.[37]

(*Amicus* Brief pp. 4–5). That argument suffers from a faulty premise. The state has a duty to make treatment *available.* It has no duty to *impose* treatment on a competent involuntary patient who prefers to refuse medication, regardless of its potential benefit.

In analyzing defendants' prediction of doom should the TRO be made permanent, it is helpful to recall the testimony of the defendants and most of their expert witnesses, to the effect that they would respect a patient's preference to refuse treatment, absent an emergency situation. In other words, although not conceding a patient's legal right to refuse treatment, the professionals' practice is to honor the refusal, except in an emergency. That testimony is inconsistent with any prediction of a chaotic institutional atmosphere if patients' wishes to refuse medication are honored. Certainly the expressed attitude of these interested professionals demonstrates that respecting and abiding by a competent mental patient's wishes concerning medication would not undermine the ethical integrity of the medical profession.

The Commonwealth does have a legitimate interest in decreasing the number of patients hospitalized, as well as the length of their stays. One need only to be alive to be aware that the costs of illness, mental and physical, are soaring. There may well be additional administrative expense and burden attached to recognizing a competent inpatient's right to refuse treatment. Stated another way, it might be less expensive for the state to deny, rather than recognize, such a right. But, factors of convenience and cost have long been regarded as inadequate justifications, standing alone, for a

---

37. The position of the *amicus* brief is seemingly at odds with that of the American Psychiatric Association: "As is the practice generally in medicine, the patients' informed consent for treatment is required except for emergency situations." American Psychiatric Association Task Force on the Right to Treatment, 134 *Am.J.Psych.* 3 (March, 1977).

state's failure to recognize and respect constitutionally protected rights. *Watson v. City of Memphis,* 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963); *Rozecki v. Gaughan,* 459 F.2d 6 (1st Cir. 1972).

One basic theme that seems to thread its way through most of defendants' arguments is that a federal court has no business second-guessing a treatment decision of a hospital staff person. This contention is like saying that once there is confinement in prison there can be no judicial scrutiny as to the conditions of confinement. As Chief Judge Bazelon of the D.C. Circuit put it:

It makes little sense to guard zealously against the possibility of unwarranted deprivations prior to hospitalization, only to abandon the watch once the patient disappears behind hospital doors.

*Covington v. Harris,* 136 U.S.App.D.C. 35, 41–42, 419 F.2d 617, 623–24 (D.C.Cir.1969). Professional judgments concerning confined persons, whether they be made by wardens in prisons or physicians in hospitals, should always be subject to judicial scrutiny, given an allegation of constitutional deprivation. Such an allegation has been made here, and it is well founded.[38]

 The defendants are enjoined from forcibly medicating committed mental patients, voluntary or involuntary, except in emergency circumstances in which a failure to do so would bring about a substantial likelihood of physical harm to the patient or others. An order will issue.

## IX. *SECLUSION*

Seclusion is the isolating of a mental patient in a small locked room. Plaintiffs contend that committed mental patients have a constitutionally protected right not to be secluded, except in emergency situations defined by M.G.L.A. ch. 123, § 21 and related DMH regulations.

Plaintiffs do not contend that seclusion is *per se* unconstitutional. They recognize that seclusion is a legitimate means for meeting emergency situations threatening the physical well-being of patients and staff. Their complaint is that seclusion was routinely used by defendants in non-emergencies for the purposes of treatment and punishment. Plaintiffs claim further that seclusion decisions, both to confine and release, were delegated by defendants to unauthorized staff personnel.

Defendants concede that M.G.L.A. ch. 123, § 21 is the controlling standard. They deny, however, that seclusion was used in other than emergency circumstances and, therefore, maintain there is no occasion for this court to grant the requested injunctive relief.

### A. *Seclusion Statutes and Regulations*

Massachusetts permits the use of seclusion only in emergency situations "where there is the occurrence of [or] serious threat of extreme violence, personal injury, or attempted suicide." DMH Reg. § 223.02; M.G.L.A. ch. 123, § 21. The statute requires that written authorization be obtained from the hospital superintendent or a designated physician prior to seclusion. If they should be unavailable, seclusion may be used, provided that such use is reported to the superintendent or physician within eight hours. The authorization form must also be signed by the person placing the patient in restraint. M.G.L.A. ch. 123, § 21; DMH Reg. § 223.05.

---

**38.** The recognition of this right finds support in two recent cases, *Rennie v. Klein,* 462 F.Supp. 1131 (D.N.J.1979) (individual action), *Rennie v. Klein,* Opinion on Plaintiffs' Motion for a Preliminary Injunction (CA No. 77–2624, Sept. 14, 1979) (class action), and *In re Boyd,* 403 A.2d 744 (D.C.App.1979). In the *Rennie* class action, the court held that involuntary mental patients possessed a qualified right to refuse psychotropic medication, requiring certain due process guarantees before drugs can be forcibly administered. Under New Jersey state law, voluntary patients possessed an absolute right to refuse. Opinion on Plaintiffs' Motion for a Preliminary Injunction at 21–22. In *In re Boyd,* an incompetent patient refused certain nonessential psychotropic drugs on religious grounds. In reversing the trial court because it did not give sufficient weight to the patient's religious beliefs, the court acknowledged the premise that medical treatment may not be imposed on a competent person who rejects it, absent a compelling state interest.

A seclusion order is limited to eight hours and the secluded patient is to be visited at least once an hour by designated ward staff. DMH Reg. § 223.06. The superintendent or a designated physician is to review the use of seclusion at least once every eight hours and authorize in writing either its continuation or cessation. His determinations and reasons therefor are to be recorded on departmental form A32. DMH Reg. § 223.07. The case record of a secluded patient is to include the name of the person authorizing seclusion, the reason for seclusion, and the time that seclusion commenced and concluded. DMH Reg. § 223.-08. Violations of seclusion regulations are to be reported to the superintendent within 24 hours. DMH Reg. § 223.09.

On May 11, 1978, during the pendency of this suit, DMH issued a clarification of its seclusion policy. Under the clarification, emergencies are said to exist when there is substantial risk, or occurrence, of serious self-destructive behavior or physical assault. "Substantial risk" is defined as the serious, imminent threat of bodily harm combined with the present ability to inflict such harm. The term "self-destructive behavior" is not limited to suicide attempts.

 Given an emergency situation, the least restrictive means of restraint is to be used. Behavioral symptoms clinically relied on as precursors of assaultive or self-destructive episodes are to be documented, as well as a description of any less restrictive alternatives that were utilized before seclusion.

 Only the superintendent or a designated physician may order seclusion. Seclusion orders are valid for no longer than eight hours. Secluded persons are to be checked at least every 15 minutes. The staff person performing the check must indicate the time of his observation and also initial the appropriate box under the section marked "Safety Checks" on Form A–32–77.

The seclusion order form (DMH A–32–72) requires that the following information be provided when seclusion is used: a) the reason for seclusion, b) a description of the emergency situation, c) the name and signature of the ordering physician, d) the name and signature of the person applying the seclusion, e) the commencement and conclusion time, f) the name of the person removing the seclusion.

The form also states that anyone ordering or applying restraints or seclusion must be familiar with the applicable laws and regulations set forth on the reverse side of the form. On the other side of the order form is a verbatim statement of M.G.L.A. ch. 123, § 21, a description of seclusion record-keeping requirements, and a summary of procedures to be used in handling violations of seclusion regulations. Also on the back of the order form is a DMH policy statement that seclusion is to be utilized as a last resort.

B. *Seclusion Facilities at the Austin and May Units*

Although they varied somewhat, the seclusion facilities at the Austin and May Units had comparable characteristics. They were small rooms, approximately six by twelve feet, unfurnished except for a mattress and cover. The floors were bare. There was an overhead light. Ventilation and heating were erratic, though not dissimilar from that in the rest of the unit. Temperature control was a chronic problem. Secluded patients were disrobed, except for underwear and a hospital gown. Often patients would remove even these garments.

Each room contained a single window that was locked and screened. The door contained a small screened window that permitted a limited view of the interior. Patients would often relieve themselves in the seclusion room and so, despite sanitation efforts, strong odors of urine and feces persisted. The rooms were chronically in need of repair and cleaning.

While secluded, patients were isolated from outside contact. They were not permitted to read, write, have visitors, or participate in any recreational, therapeutic or educational activity on the ward.

On the basis of the evidence presented, and a view of the Austin and May Units, this court finds that the seclusion rooms during most of the relevant period were dirty, stark, austere and smelly. They were unpleasant places to be confined, to say the least. But, even with their deficiencies, they did not have a dungeon-like atmosphere that would shock the conscience, thereby triggering Eighth Amendment considerations of cruel and unusual punishment. They, at least minimally, met the requirements of DMH Reg. § 223.-04(b),[39] and had the capacity to effectively isolate an out-of-control patient from other patients and staff, for the protection of all concerned.

## C. Seclusion Practices at the Austin and May Units

Between January 1, 1973 and April 25, 1975, seclusion was routinely used at both the Austin and May Units in a variety of circumstances that did not constitute an emergency as defined by M.G.L.A. ch. 123, § 21. Moreover, seclusion was used, during that period, in circumstances where a less restrictive alternative would have been adequate to terminate any existing emergency had additional staff and resources been available at the hospital.

Staff doctors commonly authorized the seclusion of patients "PRN." A doctor's PRN order has the effect of authorizing seclusion in the discretion of non-physician staff. Basically, a PRN order permitted staff to seclude "as necessary," any time of day or night, without having to consult a physician first. At times the PRN seclusion orders preceded by as many as 24 hours the incident that resulted in seclusion. When seclusion was ordered PRN, patients were not required to be examined psychologically or physically, either prior or subsequent to the seclusion.

Although the seclusion sheet required that observations be detailed, usually only a general description of the emergency requiring seclusion was given. The form often remained unsigned by a physician for several weeks after the patient had been secluded.

### 1. The Austin Unit

Prior to this court's temporary restraining order, the doctors and staff at the Austin Unit used seclusion to extinguish bizarre but non-dangerous patient behavior. Dr. Gill's policy at Austin was to permit seclusion when he felt it would be useful in the treatment of a patient. Routinely, he and the Austin staff used seclusion as negative reinforcement to modify patient behavior they deemed to be undesirable. An example is the treatment plan of "B.M." which included "a behavior modification program on ward with use of seclusion privilege for reward/punishment."

After this court's temporary restraining order, Dr. Gill directed that patients no longer be secluded as part of treatment plans. This was a change in policy and practice at the Austin Unit.

### 2. The May Unit

The May Unit also followed a policy of secluding for treatment purposes in non-emergency situations. For example, patient Sam D. was secluded each evening to prevent him from stealing from other patients. His evening seclusion was a matter of standing order. Patient Bunny R. had a treatment plan that required her to be placed in seclusion for 15 minutes when testy, or if she poked or pushed someone, although she never hit anyone. Patient Richard W. was automatically secluded for escaping. Two patients, Gail J. and Al U., were secluded for engaging in sexual relations. Patient Everett A. had a treatment plan calling for seclusion if he escaped, or would not take medication, or made verbal threats to staff. Patient Rita F. was secluded for walking nude in the day hall. Patient Barbara R. was secluded for refusing to stop talking loudly and saying

---

**39.** "Any space used for seclusion must provide for complete visual observation of the patient . . . appropriate and safe ventilation, heating, light, and access to hygienic equipment . . . ." DMH Reg. § 223.04(b).

negative things about herself. Patient David S. was secluded for masturbating in the day hall.

Hospital records relating to seclusion of patients at the Austin and May Units are voluminous, and it would be impractical to outline them here. It is sufficient to note this court's finding that the records of Austin and May demonstrate unequivocally that seclusion was routinely used in connection with treatment plans to modify behavior that could not reasonably be considered "a serious threat of extreme violence, personal injury, or attempted suicide." M.G. L.A. ch. 123, § 21. This court finds, however, that in those instances of misuse, seclusion was employed at Austin and May as a treatment modality and not as punishment.

D. *Discussion*

▇▇ Applying the standards of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), defendants claim that their seclusion practices served to protect the "private interest," 424 U.S. at 335, 96 S.Ct. 893, of the patients of the Austin and May Units. They take the position that, "[i]t is actually in the self-interest of the patient to allow staff to protect him during those times the patient is out of control . . . . [T]he state has a heavy interest in swiftly controlling the violent or potentially violent patient for his or her protection and for the protection of the other patients." (Defendants' Trial Brief p. 62).

But, whatever merit there might otherwise be in defendants' position, their faulty factual premise makes it inapposite to the Boston State situation. There were certainly many instances presented at trial of seclusion decisions having been made in response to emergency situations threatening the safety of patients and staff. As has been pointed out above, however, the great weight of evidence demonstrates that, prior to this court's restraining order, seclusion was used routinely as a treatment modality, and not merely as a procedure for restraining patients who were out of control. Such a finding is supported not only by the

weight of the testimony presented, but by the Hospital's records that were received in evidence.

Defendants ask the court to ignore the clear message of those records on the grounds that the references to seclusion as treatment were either mistakes or misnomers. But, for this court to do so would be to deny the presumed reliability of "routine, standard, and unbiased medical reports by physician specialists." *Mathews v. Eldridge, supra,* 424 U.S. at 344, 96 S.Ct. at 907. *Richardson v. Perales,* 402 U.S. 389, 404, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The bulk of these records were prepared as a matter of hospital routine long before this litigation commenced. Whatever deficiencies they may have in terms of clarity and completeness, these records do serve the purpose of clearly corroborating the testimony of those witnesses who testified that seclusion was routinely used at Boston State for treatment and not merely as an emergency restraint.

▇▇ Plaintiffs have a right to the protections afforded by the laws and regulations of the Commonwealth, the constitutionality of which is not in issue. Defendants have an obligation to provide that protection and, therefore, are enjoined from applying seclusion to committed mental patients except in emergency situations where there is the occurrence or serious threat of extreme violence, personal injury, or attempted suicide. The defendants are also enjoined from violating related Massachusetts law concerning seclusion, including state statutes and D.M.H. regulations.

In view of the court's holding, it is unnecessary to reach plaintiffs' constitutional claims in considering there request for injunctive relief against defendants' seclusion practices. But, it is necessary to decide these constitutional claims as a prelude to considering plaintiffs' federal damages claims under 42 U.S.C. § 1983. (Sec. X(B)(1) *infra.*)

▇▇ Defendants claim that there was no due process violation here "since procedures had been established in the Austin and May

units to ensure that the seclusion decision is made only in the patient's best interest." (Defendants' Trial Brief p. 64). But, plaintiffs are entitled to greater protection than defendants' proffered "best interest" test. Plaintiffs had a right under Massachusetts statutory law, M.G.L.A. ch. 123, § 21, not to be secluded except in a clearly defined emergency. Defendants had a corollary responsibility to protect their patients from a misuse of seclusion.

 Defendants' reliance on *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), overlooks the fundamental factual distinction between that case and this. There, an inmate opposing an interprison transfer was unsuccessful because "Massachusetts law conferred no right of the prisoner to remain in the prison to which he was initially assigned." 427 U.S. at 226, 96 S.Ct. at 2539. Here, however, there is a statutory right not to be secluded except in response to an emergency. Moreover, the Commonwealth's regulations established procedures designed to ensure that plaintiffs would receive the protection afforded them under M.G.L.A. ch. 123, § 21. The indiscriminate use of seclusion PRNs, the failure to properly fill out seclusion order and observation forms, and the failure to review incidents of seclusion within eight hours, were all violations of Massachusetts law. The court, therefore, holds that the defendants' actions with respect to seclusion violated plaintiffs' due process "liberty interest" under the Fourteenth Amendment.

## X. *NAMED PLAINTIFFS' CLAIMS FOR DAMAGES*

In addition to seeking injunctive relief, the named plaintiffs claim they are each entitled to an award of damages because of defendants' medication and seclusion practices. They seek such recovery under a variety of theories embodying both federal and state causes of action.

Defendants oppose any award of damages. First, they deny any lack of due care

in their treatment of plaintiffs. Second, they assert that they acted in good faith as state employees and, therefore, are immune from liability.

This court has already determined that, at one time or another, the defendants countenanced and routinely implemented policies of forced medication and involuntary seclusion of patients at Boston State in non-emergency circumstances when there was no substantial likelihood of physical harm to patients or others. Such general findings, though adequate for injunctive relief, are not sufficient to support individual damage claims by the named plaintiffs. Rather, it is necessary that each named plaintiff establish, by a preponderance of the evidence, that he or she was damaged because of defendants' impermissible seclusion or medication practices. And so, prior to analyzing the merits of plaintiffs' asserted theories of recovery, it is necessary for this court to make findings as to the factual bases of their claims.[40]

### A. *Findings of Fact Related to Damages Claims*

#### 1. *May Unit Plaintiffs*

The May Unit plaintiffs are Harold Warner, Able Bolden, Willie Wadsworth and Rubie Rogers. They claim that they were involuntarily medicated and secluded in non-emergency circumstances. First, the court examines their medication claims.

#### a. *Medication*

This court finds that only two May Unit plaintiffs—Rubie Rogers and Willie Wadsworth—were forcibly medicated in non-emergency circumstances.

 Rogers refused medication throughout her hospitalization. Her refusals were respected only when she was in "reasonable control." But, the only occasions in which she was sufficiently out of control to warrant seclusion occurred in

---

**40.** With respect to these damages claims, the court incorporates by reference all relevant findings and conclusions made in connection with the claim for injunctive relief.

September, 1973 and June, 1974. Given Rogers' innumerable refusals, the May Unit's policy to forcibly medicate in non-emergencies, and the fact that she lived on the ward for several months without requiring seclusion, this court draws the inference, and so finds, that Rogers was involuntarily medicated in circumstances that would not constitute an emergency under M.G.L.A. ch. 123, § 21.

■■■ Wadsworth was secluded for 30 days, commencing in December of 1974. While secluded, he was forcibly medicated. Since Wadsworth was already restrained by seclusion, his refusal to take medication would not have precipitated an emergency.

■■■ The court finds that Bolden and Warner were not forcibly medicated in non-emergencies. While I.M. medication was prescribed for Bolden, the court is not persuaded that these orders were carried out in non-emergencies. Rather, the evidence supports a finding that medication was forced on Bolden, if ever, only when he was acutely psychotic and out of control.

The only evidence that Warner was involuntarily medicated was through his testimony. The court does not find that testimony to be credible.

The court is also persuaded that Rogers suffered some side effects from her medication, including akathisia and akinesia, terms that have already been defined. *See* Sec. VII *supra*. Her anti-psychotic medication was terminated when these side effects were recognized by staff.[41]

### b. *Seclusion*

■■■ The evidence demonstrates that three of the named plaintiffs—Wadsworth, Warner and Bolden—were impermissibly secluded in non-emergency situations.

Wadsworth, a prior patient, was readmitted to the May Unit on Christmas Day, 1974, in an acutely psychotic condition. In addition to punching an attendant in the chest, Wadsworth rolled a coat hanger around his fist and threatened to use it if an attempt were made to seclude him. After being confronted by a number of attendants, Wadsworth went into seclusion on his own, where he spent the next 30 days.

During that time, the staff used lithium on him in an effort to control what they perceived to be his manic condition, and a number of seclusion programs were fashioned for him. After the fifth day of seclusion, his seclusion program permitted four thirty-minute time out periods per day. On the tenth day of seclusion, that time out period was increased to one hour. On the sixteenth day, he was released for one and one-half hours, six times a day, and was permitted to eat in the day hall. By the twenty-second day, he was permitted to be out of seclusion for two hours at a time.

There is little question that the first four or five days of Wadsworth's seclusion were justified. He was a relatively big and powerful young man, exhibiting hostile and assaultive behavior at the time of his admission to the May Unit.[42]

■■■ While the initial seclusion was justified, the twenty-five days of seclusion that followed were not. Progress notes indicate that, for most of that time, Wadsworth was in control.[43] By the eighth day, the night staff felt that he no longer needed to be secluded. Of the approximately two thousand entries on seclusion room observation sheets, from December 28, 1974 to January 23, 1975, only six indicated any

**41.** Rogers also suffered from neutropenia, a serious condition characterized by a decrease in the white blood count.

**42.** During the first few days of his seclusion, the staff perceived Wadsworth's potential for violence to be so great that, instead of taking him out for regular toileting, they put a bucket in the seclusion room.

**43.** After December 27, 1974, at least eleven staff members, including Wadsworth's administrator and the head nurse of the ward, described Wadsworth as calm, cooperative, ap-

agitated behavior. Three of these were on December 30, 1974.[44]

The fact that Wadsworth's treatment program permitted increasing hours out of seclusion was not a *per se* violation of M.G. L.A. ch. 123, § 21. Observations made during such "time out" periods may well serve as a barometer of a patient's ability to handle the stimulus of the ward. But, this court finds that Wadsworth's consistent non-violent behavior during time out periods demonstrated that he did not need to be secluded.[45]

Only five seclusion orders were filled out for Warner. This court finds that the seclusion order of March 22, 1975, was not prompted by an emergency. Hospital records for that day indicate that he was "creating a disturbance on other wards" and that he was "obnoxious, instigating trouble with patients and staff." Of significance is that a February 24 entry in the seclusion order book instructed that Warner be secluded for twelve hours for being a "loudmouth after warnings." The inference is warranted that the March 22nd seclusion was for disruptive behavior short of an emergency,[46] and this court so finds.

Able Bolden was secluded approximately sixty times between December 1974 and April 1975. The bulk of these seclusions occurred in February and March of 1975, while he was acutely psychotic and out of control.[47] Nonetheless, the court is persuaded that one of Bolden's seclusions was in violation of M.G.L.A. ch. 123, § 21. On March 4, 1975, Bolden was to be secluded for twenty-four hours as a result of having sex with another patient. The Hospital's records indicate that he was taken out of seclusion for a neurological appointment at Shattuck Hospital, but was to be secluded again for the balance of the twenty-four hours after his return. The inference is warranted that Bolden would not have been taken to a neurological examination if he were an emergency threat, and that his seclusion upon return from Shattuck was unrelated to any emergency.[48] The court therefore finds that the seclusion was in violation of M.G.L.A. ch. 123, § 21.

The court finds that the plaintiff Rogers has not sustained her burden of proving that any of her seclusions was in violation of the law.

### 2. *Austin Unit Plaintiffs*

Three Austin Unit patients are named plaintiffs in this suit—Donna Hunt, Elizabeth Bybel and James Colleran. All have medication and seclusion damages claims.

propriate, pleasant, and in control during his remaining seclusion.

**44.** The court does not find that the appearance and behavior of a patient while secluded is the sole factor to be considered in deciding whether a patient may safely come out of the seclusion room. Such factors, among others, are relevant to that question, however.

**45.** Although defendants dispute that Wadsworth was improperly secluded, they concede that his seclusion was affected by certain "environmental" factors, including staff shortages, patient load, and the fact that a doctor had been killed on the ward one year prior. (Defendants' Proposed Findings of Fact pp. 285–287).

**46.** While there was a seclusion order that Warner was to be secluded for twenty-four hours for sexually acting out, the court is not persuaded that this order was enforced. The court finds that Warner's seclusion for sexual behavior on the night of February 20–21, 1975, was

valid in light of his sexual activity on three previous nights with women of questionable competence to consent. Massachusetts' seclusion law permits seclusion in emergencies to *prevent sexual activity, particularly when one* of the parties has a limited capacity to consent. In the absence of less restrictive alternatives, the staff would have a duty to seclude in order to protect that party from such a sexual intrusion.

**47.** Bolden was both assaultive and delusional. His assaultive behavior included threatening patients and staff with a knife on several occasions, and initiating fistfights. He was also sexually assaultive. In his delusions, he would think he was God or a physician capable of curing himself and others.

**48.** The court's finding should not be interpreted as a holding that it is *per se* impermissible under Massachusetts law to seclude a patient for sexual activity. *See* note 46 *supra*.

### a. *Medication*

▆ This court finds that Hunt, Bybel and Colleran were forcibly medicated in non-emergency situations as part of a psychotherapeutic program.[49]

It is also apparent that Bybel and Hunt suffered side effects from the medication they received. Bybel received large dosages of phenothiazines during certain periods of her hospitalization, particularly in late January and February of 1974. There was evidence that she suffered from slow thinking and slurred speech following that medication. Hunt also experienced certain extrapyramidal effects from her heavy doses of medication, including akinesia. While one Austin Unit doctor felt that Hunt exhibited early signs of tardive dyskinesia, this court is not persuaded that she ever contracted the disease.

### b. *Seclusion*

Perhaps the most contested issue in this case concerns the seclusion programs that were instituted for Donna Hunt. At the time of her admission to the Austin Unit on January 15, 1975, Hunt was a fifteen year old moderately retarded adolescent. Like her two Austin Unit co-plaintiffs, she had a capacity for violence and out-of-control behavior.[50] In an effort to control that behavior, the staff decided to seclude her. During the next fifteen months, she was secluded for more than 1800 hours.

During Hunt's first six weeks of hospitalization, she was slowed down by her body cast and physical illness. When the cast was removed, her behavior became assaultive. In early March, a program was implemented whereby Hunt was to be secluded for a minimum of four hours after each assaultive outburst. A staff note, dated April 9, 1974, summarized the treatment program as a "mild behavior modification plan to reduce incidents of striking people." That program was unsuccessful, because Hunt seemed to enjoy the attention the seclusion process focused on her. Consequently, in an attempt to make the seclusion room a less desirable place, a plan was implemented calling for twenty-four hour seclusion following each assaultive outburst. Under this program Hunt could not be released until the twenty-four hour period expired, regardless of her apparent condition.

Shortly after its inception, this program was felt to be ineffective because Hunt's agitation and self-destructive behavior increased even while in seclusion. That program was replaced, therefore, by one requiring an eight hour seclusion. Under this program, Hunt could reduce her required seclusion time by one hour for each day she remained out of seclusion. But, her self-destructive behavior increased, and so this program was replaced by one requiring constant seclusion with one hour of time out during each of the three staff shifts. Her

---

**49.** James Colleran's receipt of intramuscular medication (Thorazine) was documented in the record. Bybel and Hunt would generally accept their medication after being threatened with an injection by needle.

Chris Demers, who ran a special program for the retarded in the Austin Unit, testified that Hunt was involuntarily medicated in non-emergencies at least twenty-five times in 1975, ten times prior to the filing of this lawsuit. On the occasions when Hunt was refusing medication she would generally be outwardly calm, talking to other patients or walking around by herself. Elizabeth Franceen, a nurse attendant at the Austin Unit, testified that Bybel would refuse her anti-psychotic medication about 80% of the time. According to Franceen, Bybel may have been defiant about refusing her medication, but did not act in any kind of exaggerated or outrageous way.

**50.** On November 12, 1973, Hunt was treated at Boston City Hospital for compression fractures after jumping from the second story of her home following an argument with her brother. She was discharged in a full body cast on November 30. On January 6, 1974, she was readmitted to the BCH for a seizure work-up and for evaluation after allegedly threatening her mother with a knife and throwing her across a room. During the second admission, Hunt's behavior became increasingly out of control, to the point where she attempted to strangle one of the hospital's social workers. While the hospital attempted to place Hunt in an adolescent facility, all efforts proved futile. She was considered too smart, too retarded, or too violent for any such placement. She was sent to the Austin Unit as a last alternative.

time out could increase by one hour per shift if she handled it well.

As of July 1974, a new program was instituted whereby Hunt was required to spend one hour of the day and evening shifts in her room to reduce stimulation and prevent her from engaging in assaultive and self-destructive acts. If she would not spend the time in her room, the program required that she spend it in seclusion. She was secluded less during July and August than during the two prior months.

Hunt's mother came to visit her at the end of August of 1974. That visit had an adverse effect. According to hospital records, Hunt was out of control 98% of the time thereafter. In response, the Austin Unit staff reinstituted the twenty-four hour seclusion program that allowed increased time out for good behavior.

An October 1974 progress note indicated that it took Hunt the better part of the month to work her way out of seclusion. From that point on, Hunt was no longer secluded for fixed periods, but was required to spend one hour a shift in her room, or face seclusion. By November of 1974, she was able to remain out of seclusion most of the time. From then through February, 1975, her seclusion time decreased steadily to the point where she was secluded only forty hours during February.

■ While Hunt was chronically out of control during much of 1974,[51] this court is persuaded that she was secluded in situations that did not pose a serious threat of extreme violence, personal injury, or attempted suicide. In those situations, seclusion was used as a treatment modality and not a restraint.[52]

■ Like Donna Hunt, James Colleran was admitted to the Austin Unit at the age of fifteen. From October of 1973 through April of 1975, he was secluded a total of forty-five times. A substantial number of those seclusions revolved around his sexual behavior. Colleran could be extremely assaultive when he was sexually agitated— engaging in persistent touching, pinching and fondling of both male and female patients. On other occasions, he would expose his genitals on the ward. In the spring of 1975, this behavior escalated to the point where Colleran was consistently subject to assault by patients who were provoked by his unsolicited sexual advances.

**51.** Janet Lapierre testified that after Hunt was released from seclusion during the four hour program, "she would come out and be immediately out of control again." At trial, Dr. Gill described her out of control behavior as follows:

She would ask for something to be given to her. It might be given to her and three minutes later she'd be asking for something else. These demands would escalate until she was again confronted with a negative response, and then she would become more angry. Fairly typically, she would start pacing up and down the corridors. She did quite a bit of pacing at those times, not just slowly walking up and down but angrily pacing in a very insistent manner up and down, and she would start banging her fist on the walls, and then somebody would ask her to stop, that she was disrupting other patients, and she would start swearing or yelling. She would push somebody. She would run down the corridor. People would try to stop her and it would explode into an episode of screaming, kicking, spitting, biting, punching. You name it. I mean, she was just wildly assaultive on those occasions.

**52.** This finding is supported in particular by Hunt's seclusion programs that permitted her "to work her way out" of seclusion if she behaved well during time out. There is absolutely no indication in the record that her good behavior during time out could result in her not being put back in seclusion. The design of her programs required seclusion for fixed time periods, regardless of her self-control in seclusion, or during time out periods.

It is also worthwhile to note that there are more than two hundred A–32–72 forms in which the reason listed for seclusions is "per treatment plan." There were seven seclusions for "refusing to lie down."

Hunt also engaged in a variety of self-destructive behavior, including swallowing flip-tops and sticking cigarettes in her ear. She was secluded over sixty times for those incidents. It does not appear, however, that Hunt's self-destructive behavior constituted a serious attempt at suicide, but it was dangerous. Given the Austin Unit's inability to control her, and the availability of soda cans and cigarettes on the ward, this court does not find that it was improper to seclude Hunt after she swallowed a flip-top or stuck a cigarette in her ear.

Colleran maintains that the Austin Unit staff utilized seclusion as a behavior modification to extinguish his sexual behavior. One of Colleran's treatment plans stated that he was to be secluded for "a period not to exceed three hours for exposure of sexual organs and/or overt contact with female staff and patients—if verbal request to discontinue such acting out is not responded to." This court is persuaded that Colleran's sexual aggressiveness constituted an emergency situation at the Austin Unit.[53]

 The plaintiff Bybel was secluded for more than one thousand hours from January 1, 1973 to April 30, 1975. The bulk of these seclusions, and the ones to which most of the testimony was directed, occurred in two separate periods: April of 1974 (138 hours) and March and April of 1975 (575 hours). This court finds that Bybel was out of control during much of her stay at the Austin Unit,[54] but that she was occasionally secluded in non-emergencies.[55]

### B. Legal Conclusions Related to Damages Claims

#### 1. Plaintiffs' Federal Claims

Before analyzing the specifics of plaintiffs' federal claims, it is useful to consider the essential elements they must prove, as well as defenses that may be available to meet such claims.

 Any person who acts under color of state law to deprive another of a constitutional right may be required to compensate that person by an award of money damages. 42 U.S.C. § 1983.[56] This court has already determined that all committed mental patients have a constitutional right not to be forcibly medicated or secluded except in a clearly defined emer-

---

**53.** This finding is supported by a February 28, 1975 progress note which, after describing Colleran's sexual acting out, goes on to state:

> The latter behavior increasingly created crisis situations on the ward, involving serious threats of personal injury to Jimmy as patients provoked by his unsolicited sexual contacts made threats of retaliative physical harm, some patients being forcibly interrupted in the act of striking out at Jimmy.

Colleran contends that this progress note indicates that it was not he who was out of control, but the patients he agitated. As a result, Colleran argues, only the out-of-control patients should have been secluded. This contention barely merits comment. It is clear that the seclusion statute envisions that the person creating the emergency situation should be secluded, not the victim.

**54.** Bybel's prolonged seclusion in April and May of 1974 occurred following her arrest by federal marshalls for stealing a mail bag, and handing out the mail on Boston Common. She was highly agitated, hostile, and delusional upon her return. In the opinion of her therapist, Layne Erban, Bybel was a significant suicide threat—she talked about killing herself and tied belts and ropes around her neck.

On March 21, 1975, a serious fire occurred in the Austin Unit, burning out the whole back section of the ward. Bybel escaped during the evacuation. She later told Erban that she had set the fire in order to escape. She was returned by the police on March 24th, in an extremely manic and deteriorated condition. She was assaultive and threatened suicide. The staff concluded that, given Bybel's increas-

ing deterioration since the beginning of 1975, her continued escapes placed her in a serious personal emergency. Accordingly, she was put into seclusion.

The court explicitly rejects Bybel's contention that the threat of her escape did not justify seclusion. Bybel's escapes almost inevitably involved escapades of significant risk to her physical well-being. When she was returned from an escape, it was usually under police escort. Bybel's desire to escape was so great that she even set a fire on the ward to achieve her purpose. The Austin Unit staff was legitimately concerned that her escapes posed a threat to her life.

**55.** This conclusion is supported not only by the testimony of staff attendants at the Austin Unit, but also references to certain documentary evidence. The latter suggested that not only was seclusion part of Bybel's "treatment plan," but also that she was automatically secluded for such reasons as screaming, abusive language and careless smoking—situations which this court is persuaded did not constitute emergencies.

**56.** Section 1983 provides in relevant part that "every person" who, acting under color of state law, deprives another of a constitutional right is answerable to the injured party "in an action at law, suit in equity, or other proceeding for redress." Each of the defendants was an employee of the executive branch of the state, and was acting as such during the times relevant to this law suit.

gency situation. In order to recover under § 1983, each of the named plaintiffs must demonstrate, by a preponderance of the evidence, a deprivation of at least one of these constitutionally protected rights, and that such deprivation was the proximate cause of injury to that plaintiff.

■ Given a demonstration of personal constitutional deprivation, a plaintiff may be entitled to an award of compensatory damages for any physical or emotional harm caused thereby, as well as an award for all pecuniary loss. *Magnett v. Pelletier*, 488 F.2d 33 (1st Cir. 1973). In addition, exemplary or punitive damages may be awarded if the trier of fact is persuaded, by a preponderance of the evidence, that a defendant's actions amounted to a demonstration of improper motive, outrageous conduct and overall bad faith. *Caperci v. Huntoon*, 397 F.2d 799 (1st Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968); *Mansell v. Saunders*, 372 F.2d 573 (5th Cir. 1967).

■ The character of defendants' conduct has relevance beyond the issue of a possible award of exemplary damages, however. Indeed, a persuasive demonstration of good faith by a defendant may entitle him to qualified immunity from any award of money damages, despite the fact that his actions caused a constitutional deprivation.

These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974).

In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a suit brought by students against high school officials, the Supreme Court defined the phrase "good faith" in terms stressing both objective and subjective components:

> The official himself must be acting sincerely and with a belief that he is doing right, but an act violating . . . constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law . . . than by the presence of actual malice.

> . . . A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

420 U.S. at 321, 322, 95 S.Ct. at 1000–01.

■ Although the "good faith" definition enunciated in *Wood* embodies both objective and subjective standards, mere good intentions or "[s]ubjective good faith in one's conduct is not sufficient to protect an official from civil rights liability." *Perez v. Rodrigues Bou*, 575 F.2d 21, 23 (1st Cir. 1978). The test is whether defendants "knew or should have known" that their actions would violate plaintiffs' constitutional rights. *Wood v. Strickland, supra*, 420 U.S. at 322, 95 S.Ct. 992; *O'Connor v. Donaldson*, 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).[57]

Further guidance on the availability of a good faith defense for actions taken in a mental hospital setting is provided by the recent First Circuit case of *Downs v. Sawtelle*, 574 F.2d 1 (1st Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978). There, defendant doctors were charged with conspiring to sterilize a deaf mute without her consent.

---

**57.** In *O'Connor*, the Court recognized that the good faith immunity defense was available to administrators at state mental hospitals.

[I]f a jury could reasonably conclude that Dr. Curtis determined that sterilizing the plaintiff was for her own good or the good of society and as a consequence of that belief ignored indications from the plaintiff that she did not consent to the operation, or if it could conclude that he attempted to take advantage of her mental and communication limitations to unduly influence her decision, he would be liable under both components of the *Wood* test. He should reasonably have known that such conduct amounted to an unconstitutional deprivation and he would be acting with a malicious motive. The fact that the doctor thought he had plaintiff's best interests at heart would not justify a qualified immunity for constitutional purposes any more than would the belief, if asserted by a discriminatory employer or educator, that minority group members are happier and more productive in a segregated environment.

574 F.2d at 12 (footnote omitted).

■ In determining the validity of defendants' proffered good faith defense, this court must consider what they "knew or should have known" with respect to plaintiffs' constitutional rights in relation to the state of the law during the relevant period of 1973 to 1975. *Haines v. Kerner*, 492 F.2d 937, 941 (7th Cir. 1974); *Hostrop v. Board of Jr. College, Dist. No. 515*, 523 F.2d 569, 577 (7th Cir. 1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976). The defendants are not charged with a duty to anticipate then uncharted constitutional developments. *Wood v. Strickland, supra*, 420 U.S. at 322, 95 S.Ct. 992.

■ In addition, the court must evaluate the actions of the defendants in the context of any exigencies that existed on the wards of the Boston State Hospital. These include the adequacy of facilities and staff, as well as the potential for disruptive, if not violent, behavior at that institution. *See Glasson v. City of Louisville*, 518 F.2d 899, 908 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975).

Any evidence as to defendants' motive in forcibly medicating or secluding plaintiffs must be weighed. For example, it would be relevant to consider whether the evidence demonstrated that a plaintiff was either forcibly medicated or secluded as an act of punishment, vengeance, or even sadism. On the other side of the coin, it would be relevant, although not controlling, *see Downs v. Sawtelle, supra*, that the defendants' sole motive was to treat and help the affected plaintiff.

■ Consideration should be given as well to the defendants' conduct in relation to the plaintiffs' helplessness and dependency. Callous or wanton neglect may warrant a finding of malice, as may reckless indifference, *Harper v. Cserr, supra*, 544 F.2d at 1125; *Kelley v. Dunne*, 344 F.2d 129, 133 (1st. Cir. 1965) (*quoting Vigoda v. Barton*, 348 Mass. 478, 204 N.E.2d 441 (1965)). A finding of wanton or reckless behavior may be based in part on a determination that the victim was helpless. *Duchesne v. Sugarman*, 566 F.2d 817, 828 (2d Cir. 1977).

■ Application of a good faith defense implies that, at the least, a mistake was made—something went wrong. The evolution of the defense is in part due to a recognition that the public interest is best served by enabling officials in challenging positions, such as the defendants here, to perform their duties with discretion, but without intimidation. This means that a monetary award of damages should not be imposed "for mistakes which were not unreasonable in the light of all the circumstances . . . ." *Wood v. Strickland, supra*, 420 U.S. at 319, 95 S.Ct. at 999.

■ Having these standards in mind, this court determines that defendants' good faith immunity defense to plaintiffs' § 1983 claims is valid. The defendants desired only to help plaintiffs. Their seclusion and medication practices were intended as treatment, not punishment. The prime constitutional issue here—the right to refuse treatment—was not one that a doctor was bound to anticipate in 1973. Moreover, that practice received tacit support from the Su-

preme Judicial Court in 1968 and had never been ruled unconstitutional.[58]

Of significance to this court, as well, are the less than desirable conditions in which defendants were required to deal with plaintiffs. The facilities and support staff at Boston State were marginal, at best. In contrast, the patient population was extremely demanding, both in terms of numbers and their potential for disruptive behavior. Defendants did not have the luxury of detached, leisurely reflection as they faced the innumerable crises that characterized daily living on the Austin and May wards. They met those crises decisively, with the purpose of restoring plaintiffs to self control. To hold them liable in damages, given the totality of the circumstances presented by the evidence in this case, would be unfair to them and contrary to the public interest.

### 2. *Plaintiffs' State Claims*

a. *Assault and Battery, False Imprisonment*

Plaintiffs maintain a right to recover damages under the intentional tort theories of false imprisonment and assault and battery. The latter requires proof of an unconsented touching, however slight, that is either harmful or offensive. The former consists of the unlawful restraint of a person's freedom of movement.

This court assumes as inevitable the fact that the named plaintiffs, while institutionalized, were either touched or restrained against their wills. Plaintiffs argue that the traditional common law elements of these intentional torts are applicable to such occasions. This court disagrees.

Common sense, if nothing else, argues against the literal application of these torts to the activities and environs of a state mental hospital. To impose liability on physicians for good faith, non-negligent touchings and restraints would impede if not immobilize the administration of such an institution.

While there is no Massachusetts case directly on point,[59] a number of other jurisdictions have recognized the reality of the situation and have rejected the notion that traditional intentional tort concepts apply to the care of the institutionalized mentally ill. In the case of *O'Donoghue v. Riggs,* 73 Wash.2d 814, 440 P.2d 823, 828 n. 2 (1968), the Supreme Court of Washington held:

> One who enters a hospital as a mentally ill person either as a voluntary or involuntary patient, impliedly consents to the use of such force as may be reasonably necessary to the proper care of the patient or for the necessary enforcement of reasonable rules governing the patient's safety and health. . . . So, also, the reasonable use of force may be necessary within a mental hospital in the proper care and treatment of a patient and in order to protect him or others from harm.

440 P.2d at 828 n. 2.

Other jurisdictions have also recognized the law of malpractice to be more appropriate than intentional tort theories in deciding claims arising at mental hospitals. In *Hammer v. Rosen,* 7 N.Y.2d 376, 198 N.Y. S.2d 65, 165 N.E.2d 756 (1960), the court held that treatment challenged there,

---

**58.** The only federal case prior to this one which has recognized a federal constitutional right to refuse psychotropic medication is *Rennie v. Klein,* 462 F.Supp. 1131 (D.N.J.1978).

In *Nason v. Superintendent of Bridgewater State Hospital,* 353 Mass. 604, 610 n. 7, 233 N.E.2d 908, 912 n. 7 (1968), the Supreme Judicial Court, in discussing the general quality of care at the Bridgewater State Hospital, noted that "[v]arious Bridgewater procedures were inconsistent with good practice. . . . Drugs were not distributed under proper supervision nor administered involuntarily where patients refused medication."

**59.** In *Belger v. Arnot,* 344 Mass. 679, 183 N.E.2d 866 (1962), plaintiff claimed that certain involuntary electroshock treatments she received while hospitalized pursuant to a temporary ten day paper amounted to a battery. The Supreme Judicial Court held that "by necessary implication" of the statute authorizing ten day admissions, physicians who treat patients needing immediate treatment are not liable if they act in good faith and without negligence. 183 N.E.2d at 869.

though clearly a battery, constituted a prima facie case of malpractice that could be rebutted by evidence that such treatment was proper. 198 N.Y.S.2d at 67, 165 N.E.2d at 757. In *Morgan v. State,* 40 A.D.2d 891, 337 N.Y.S.2d 536 (1972), a damage award to an involuntarily committed patient who had been tied to her cot for several weeks was reversed because there was "no medical testimony that the actions involved were improper." 337 N.Y.S.2d at 537.

■ This court concludes, therefore, that the traditional elements of these intentional torts should not be the standard by which the defendants' conduct is judged. Rather, determination of defendants' liability should be based on a comparison of their conduct with standards of reasonable medical practice. The *Belger* case, *supra,* indicates that the Supreme Judicial Court would take such an approach if this issue were presented to it.

b. *Malpractice*

■ In order to sustain their medical malpractice claim, plaintiffs must prove the defendants' negligence by establishing: 1) a duty of due care owed them by defendants, 2) the breach of that duty, and 3) they were damaged as a proximate result of that breach.

■ The standard of care owed by a physician to a patient in Massachusetts was defined by the Supreme Judicial Court in the case of *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793 (1968):

The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession. In applying this standard it is permissible to consider the medical resources available to the physician as *one* circumstance in determining the skill and care required. Under this standard some allowance is thus made for the type of community in which the physician carries on his practice. See *Prosser, Torts* (3d ed.) sec. 32 (pp. 166–167); compare Restatement 2d: Torts, Sec. 299A, comment g.

One holding himself out as a specialist should be held to the standard of care and skill of the average member of the profession practicing the specialty, taking into account the advances in the profession. And, as in the case of the general practitioner, it is permissible to consider the medical resources available to him. 354 Mass. at 109, 235 N.E.2d at 798. As with other negligence actions, the damages that are compensable in a malpractice case include past and future pain and suffering, medical expenses, diminution in earning capacity, and loss of consortium. *See Cuddy v. L & M Equipment Co.,* 352 Mass. 458, 225 N.E.2d 904 (1967); *Rodgers v. Boynton,* 315 Mass. 279, 280, 52 N.E.2d 576, 577 (1943); *Donoghue v. Holyoke St. Ry. Co.,* 246 Mass. 485, 141 N.E. 278 (1923); *Cochran v. City of Boston,* 211 Mass. 171, 97 N.E. 1100 (1912).

■ In determining whether any of the defendants was negligent, the reasonableness of their conduct must be weighed in the context of the circumstances and surroundings in which they practiced. It is relevant, therefore, to consider the medical resources and support facilities available to the defendants at the Boston State Hospital. *Brune v. Belinkoff, supra,* 354 Mass. at 109, 235 N.E.2d 793.

These resources were barely adequate. For most patients, Boston State was the end of the treatment line. Its prime function was to deal with the most disturbed and potentially violent patients, those for whom local mental health clinics could not care. Despite this most challenging assignment, salaries at Boston State, and other state institutions, were not competitive with private institutions such as McLean's Hospital. It is not surprising, therefore, that the Commonwealth found it difficult to attract and retain competent and experienced staff.[60]

---

**60.** State hospitals in Massachusetts often are operated on about one-half of the staff-patient ratio of private hospitals.

In addition to staffing deficiencies, the May and Austin physical plants were anything but models. Their heating systems were archaic and unreliable. Seeping steam caused cracked and peeling paint. Inadequate lighting cast a gloomy pall. Their horse trough type bathing facilities were termed "Dickensian" by Dr. Gill.

Naturally, the quality of care that May and Austin doctors were able to provide was affected by such factors. But, defendants had little control over the quality or quantity of staff or physical resources. Like front line surgeons, they were required to work with what they had. The court concurs with the position of the American Psychiatric Association that it would be unjust and unreasonable for courts to hold psychiatrists personally and individually responsible for resource deficiencies that are actually the responsibility of society.[61] Such a decision would only deter qualified psychiatrists from working in the very setting where they are most needed.

■■■ Except in the unusual case in which " 'the negligence and harmful results are sufficiently obvious to lie within common knowledge,' " the elements of a medical malpractice case must be proved by expert testimony. *Haggerty v. McCarthy,* 344 Mass. 136, 139, 181 N.E.2d 562, 565 (1962) (quoting *Cyr v. Giesen,* 150 Me. 248, 252, 108 A.2d 316, 318 (1954)); *McCarthy v. Boston City Hospital,* 358 Mass. 639, 643, 266 N.E.2d 292, 295 (1971). This case is no exception. The complex psychiatric and medical issues involved are beyond the "common knowledge" of this court. The plaintiffs, therefore, must establish by expert testimony the average degree of care and skill exercised by qualified practitioners in comparable circumstances, and the fact that defendants deviated from such standards.

There was conflicting expert testimony as to the reasonableness of the medical treatment given the named plaintiffs by defendants. This court permitted plaintiffs to introduce testimony of non-psychiatrists on the issue of defendants' lack of due care. The court deems such evidence to have been competent, particularly with respect to medication issues.

The proper use of medication and the predictable consequences of medication are matters not peculiar to the specialty of psychiatry. The fact that medication is used at a mental institution does not make the subject any more parochial. The same is true with seclusion practices and their predictable consequences. Seclusion is not an exclusive preserve of the psychiatrist, any more than is medication. Indeed, defendants concede a delegation of at least some seclusion decisions on a PRN basis to non-physician staff.

■■■ Nor is a witness' competency to testify affected by the fact that he may be a disciple of schools, theories, and approaches to the diagnosis and treatment of mental disease that are different from those followed by the defendants. Such factors, however, may affect the weight of the testimony and whether, as a matter of discretion, the court will permit such testimony. A malpractice case is not made out because an expert disagrees with a defendant as to what is the best or better approach in treating a patient. Medicine is an inexact science and eminently qualified physicians may differ as to what constitutes a preferable course of treatment. Such differences as to preference do not amount to malpractice. To constitute evidence of malpractice, the proffered expert must testify clearly that there has been a departure from acceptable medical standards. *Kiley v. Dervin,* 314 Mass. 478, 50 N.E.2d 393 (1943); *Bouffard v. Canby,* 292 Mass. 305, 198 N.E. 253 (1935); *Haggerty v. McCarthy, supra.*

■■■ The expert witness' education, training, experience and overall credentials, of course, affect the credibility of that opinion and the weight it will be given. That the admission of plaintiffs' expert testimony here was properly within the court's

---

**61.** "Position Statement on the Right to Adequate Care and Treatment for the Mentally Ill and Mentally Retarded," *Am.J.Psych.,* March, 1977, at 355.

discretion is underscored by the comments of Chief Justice Burger when a member of the D.C. Circuit:

> [I]t would be proper, if a clinical psychologist is found qualified to testify as to the presence or absence of a mental disease and does so in opposition to a psychiatrist, to tell the jury they could take into account the difference in the education, training and experience of psychologists and psychiatrists and the absence of medical training in the former.

*Jenkins v. United States,* 113 U.S.App.D.C. 300, 314, 307 F.2d 637, 651 (D.C.Cir.1962) (concurring opinion).

In any event, that evidentiary issue is in a sense academic, as this court is not persuaded that any of the defendants was negligent in the treatment of any plaintiff.

### 1. *Medication Negligence Claims*

■ Although this court has already determined that an improper policy of forced medication was routinely followed at the Austin and May Units, it has also found that only Hunt, Bybel, Colleran, Wadsworth and Rogers of the named plaintiffs were forcibly medicated. Moreover, the fact that defendants' forced medication was unconstitutional and warranted the granting of injunctive relief does not require a finding of negligence. That factor is one of many that may be considered in determining whether defendants' treatment of the named plaintiffs fell below standards of reasonable medical care.

■ An additional factor to be considered is the medication itself, and whether its use was contrary to accepted medical standards. This court is persuaded by the weight of the evidence that it was reasonable medical practice for the defendants to utilize the psychotropic medication they did here. Regardless of possible adverse side effects, such medication is of significant value in treating psychotic patients. Plaintiffs have not persuaded this court that their use constituted medical malpractice.[62]

■ In addition, this court is not persuaded that defendants' choices and prescribed dosages of psychotropic medication fell below acceptable medical standards. To be sure, those receiving the medication suffered predictable side effects. Indeed, it was necessary to alter Rogers' treatment because of side effects.[63] None of the named plaintiffs suffered from tardive dyskinesia or any permanent or prolonged disability as a result of the medication. To the contrary, most showed eventual improvement. In short, the fact that plaintiffs had a constitutional right to refuse psychotropic medication does not mean that its use was inconsistent with accepted medical standards.

An additional basis for plaintiffs' medication malpractice claims is that the de-

---

**62.** This court's conclusion is supported not only by expert testimony in the case, but also by articles in the literature. *See, e. g.,* Shader, *Manual of Psychiatric Therapeutics,* 84. ("The efficacy of neuroleptic agents . . . in treating acute and chronic schizophrenic patients has been established by a vast number of adequately designed and controlled studies conducted over the past 20 years. These studies demonstrate the usefulness of neuroleptics in reducing disordered thinking, anxiety, delusions, hallucinations, social withdrawal, and other symptoms associated with schizophrenia.") *See also* Klerman, "Pharmacotherapy of Schizophrenia," 25 *Annual Review of Medicine* at 213 (1974).

**63.** Bolden claims that Drs. Osborne and Mazmanian were negligent in continuing him on Prolixin after it became obvious that he was suffering from a paradoxical reaction to the

drug. A paradoxical reaction is characterized by an increase in the psychotic condition of the patient, rather than a decrease. It is a relatively rare and unexpected consequence of drug administrations. The court is not persuaded that Bolden experienced such a reaction. Furthermore, as soon as Dr. Mazmanian assumed responsibility for treating Bolden, he sought assistance from Dr. Jonathan Cole, an experienced psychopharmacologist. Under the circumstances, this court does not find Dr. Mazmanian's treatment practices to have been unreasonable.

A patient's reaction to specific dosages of a particular drug can not be predicted with certainty. That is why the administration of drugs must be monitored with care, and appropriate modifications in prescription be made. This court finds that defendants' prescription and monitoring practices were not unreasonable.

fendants failed in their duty to fully inform them as to the potential risks and benefits of their prescribed medication. Basically, that claim is grounded on the doctrine of "informed consent."

That doctrine has yet to be formally recognized in Massachusetts as an independent tort cause of action. It is, nonetheless, a concept of "widespread recognition."[64] Its theme is basically one of negligence—a failure on the part of a physician to provide sufficient information as to the competing risks and benefits of medication so that the patient can make an informed judgment whether or not to accept that treatment.[65]

■ The scope of a psychiatrist's duty to inform mental health patients is not clearly defined. Defendants argue that the institutionalized patient lacks the capacity to make an informed decision on his treatment and that, in any event, disclosure of the potential side effects of medication may not be in the patient's best interest.[66] But this court has already rejected defendants' notion of the presumed incompetence of

committed patients to make treatment decisions. See Sec. VIII(A) supra. And, although disclosure of potential side effects of medication may be frightening to the mental patient, this court is not persuaded such a prospect, standing alone, justifies a failure to provide a patient with sufficient information to make an informed treatment decision.[67] As with any other determination of reasonable conduct, whether a physician has sufficiently informed a patient depends on an analysis of all the surrounding circumstances.[68]

■ Even if the Supreme Judicial Court would recognize an "informed consent" cause of action, plaintiffs here would be unsuccessful in such a claim. First, this court is not persuaded that, during the relevant period of 1973 to 1975, a failure to inform a mental patient of a medication's characteristics would have been considered sub-standard medical practice. And so, although the doctrine of informed consent has been implicitly accepted by this court in its injunctive decree, defendants may not be

**64.** Superintendent of Belchertown v. Saikewicz, 373 Mass. 728, ——, 370 N.E.2d 417 (1977). See also Schroeder v. Lawrence, 372 Mass. 1, ——, 359 N.E.2d 1301, 1303 (1977) (the Supreme Judicial Court has had no occasion "to take a measured position on 'informed consent.'")

**65.** Jurisdictions are divided on whether the plaintiff must prove a deviation from the procedure normally employed by other physicians practicing in the community. Compare Canterbury v. Spence, 150 U.S.App.D.C. 263, 274, 464 F.2d, 772, 783 (D.C.Cir.1972) (no proof of deviation necessary), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), with Aiken v. Clary, 396 S.W.2d 668, 675–76 (Mo.1965) (duty depends on whether it was the custom of physicians practicing in the community to make particular disclosure to plaintiff).

**66.** See, e. g., Roberts v. Wood, 206 F.Supp. 579, 583 (S.D.Ala.1962).

**67.** The physician's privilege to withhold information for therapeutic reasons must be carefully circumscribed, however, for otherwise it might devour the disclosure rule itself. The privilege does not accept the paternalistic notion that the physician may remain silent simply because divulgence might prompt the patient to forego therapy the physician feels the patient really needs.

Canterbury v. Spence, supra, 150 U.S.App.D.C. at 280, 464 F.2d at 789 (footnote omitted).

**68.** Emergencies have traditionally been recognized as exceptions to the informed consent doctrine. Canterbury v. Spence, supra, 150 U.S.App.D.C. at 279, 464 F.2d at 788.

Imposing a duty of informed consent with respect to antipsychotic medication finds support in a recent article, "Tardive Dyskinesia and Informed Consent," supra note 5. "Informed consent is a basic principle of medicine that applies to the practice of psychiatry as well as it does to the practice of general medicine and surgery in the United States today." Id. at 172 (footnote omitted).

The American Psychiatric Association takes the following position on informed consent:

The American Psychiatric Association is aware of the possibility that the right to adequate care and treatment may be understood and even be used in some cases in a coercive manner. We therefore wish to clearly indicate that our concern is that adequate care and treatment be available. As is the practice generally in medicine, the patient's informed consent for treatment is required except for emergency situations.

American Psychiatric Association Task Force on the Right to Treatment, supra note 37, at 3.

held accountable in damages for failing in 1973 to anticipate the recognition in 1979 of a competent committed mental patient's right to refuse treatment.

■ Moreover, the plaintiffs have not sustained their burden of proving that any of them has sustained the injury—tardive dyskinesia—that they claim the defendants should have warned them of prior to medicating. As the Supreme Judicial Court has remarked in dictum, "on any view of a doctrine of 'informed consent,'" a plaintiff must prove not only that the undisclosed risk was material, but also "that it materialized." *Schroeder v. Lawrence*, 372 Mass. 88, 359 N.E.2d 1301, 1303 (1977).

## 2. Seclusion Negligence Claims

This court has already determined that seclusion was routinely used as a non-emergency treatment modality at both the Austin and May Units, in violation of M.G.L.A. ch. 123, § 21. Plaintiffs Hunt, Bybel, Wadsworth, Warner and Bolden were secluded under non-emergency situations as part of behavior modification programs.

■ Defendants' violation of M.G. L.A. ch. 123, § 21 does not require a finding of negligent medical practice. Violation of a "penal statute designed to secure safety" is not negligence *per se* when it does not appear "by express terms or by clear implication to have been the legislative intent." *Richmond v. Warren Institution for Savings*, 307 Mass. 483, 485, 30 N.E.2d 407, 408 (1940).[69]

■ Although M.G.L.A. ch. 123, § 22 grants immunity to physicians who restrain patients in accordance with Section 21,[70] that fact is not a clear expression of legislative intent to automatically impose liability for a deviation from the statutory mandate. Rather, defendants' conduct must be measured by the standards and skill that pre-

vailed in the years 1973 through 1975 among ordinary psychiatrists, *Brune v. Belinkoff, supra*, 354 Mass. at 109, and by the totality of relevant circumstances, including such factors as were considered by this court in allowing defendants' good faith defense to plaintiffs' § 1983 claims. *See* Sec. X(B)(1) *supra*.

■ The court initially finds that, although the decision to seclude was usually made by the staff, the defendants were aware, or should have been, that seclusion was being routinely used as treatment, and that such a practice was contrary to law. The responsibility for seclusion decisions was the physicians', not the staff's. Defendants may not avoid that responsibility by arguing that they should not be vicariously liable for the acts of staff.

■ As noted, the plaintiffs were secluded in circumstances not constituting emergencies under Massachusetts law. There were two general categories of non-emergency seclusions: 1) seclusions in situations where the staff felt the patient was in need of restraint, even though the patient was not posing an imminent threat of extreme violence, personal injury or attempted suicide, and 2) seclusions as part of a treatment plan. With respect to the first category, this court does not find the defendants' conduct to have been a departure from reasonable medical standards. Even in those instances when plaintiffs' behavior precipitating seclusion constituted something less than physical emergency as defined by M.G.L.A. ch. 123, § 21, it was, nonetheless, highly disturbing to other patients and potentially disruptive. Although Massachusetts law proscribes seclusion in that situation, this court is not persuaded that defendants' response to such disruptive behavior, under all the circumstances, was unreasonable.[71] The weight of the evidence

---

**69.** *See also Dolan v. Suffolk Franklin Savings Bank*, 355 Mass. 665, 667, 246 N.E.2d 798, 800 (1969) (violation of safety statute evidence of negligence).

**70.** "Physicians . . . shall be immune from civil suit for damages for restraining . . .

any person . . . to a facility, . . . providing said physician acts pursuant to the provisions of this chapter."

**71.** Even the state concedes that the staffing patterns affected the need to seclude patients. Lack of staffing diminishes the opportunity for

persuades this court that defendants' decision to seclude was a reasonable means of maintaining some stability and order on the ward, without causing disproportionate harm to the person secluded.[72]

■ With respect to the second category of seclusions, the court again finds no liability should attach to defendants' conduct. Seclusion was used to remove the patient from the stimulus of the wards when it was considered necessary to do so in order to strengthen and maintain a patient's sense of control. In the sense that it was intended to improve the patient's ability to cope, seclusion in those instances was treatment. On the basis of the expert testimony and evidence presented at trial, this court is not persuaded that such treatment violated standards of reasonable medical practice,[73] even though proscribed by state statute.

■ The situation with respect to Donna Hunt, though more egregious, was nonetheless comparable. Seclusion was used to remove her from the stimulus of the wards and also as a means for modifying her behavior through negative reinforcement. As with all plaintiffs' seclusion programs, there was no element of punishment, sadism or vindictiveness in Hunt's treatment program. It was a studied effort to assist a most difficult patient in gaining control. As with the other named plaintiffs, this court is not persuaded that the defendants were negligent in formulating and implementing her seclusion programs.

■ On the basis of the evidence submitted, therefore, this court determines that plaintiffs have not met their burden of proving that defendants' medication and seclusion practices failed to meet acceptable medical standards.[74]

---

individualized attention and the effective monitoring of patients. The low pay scale also affects seclusion in that the state cannot retain staff who have expertise "and some degree of calmness" in the way they approach a potentially violent patient. (Defendants' Proposed Findings of Fact pp. 478–80.)

72. The court is persuaded from the evidence that it is difficult to predict a bona-fide emergency with any certainty. One author has termed the prelude to an unequivocal emergency as a "gray zone." "Since it is in no one's interest—the patient's or staff's—for an actual assault to take place, the use of seclusion may be anticipatory." Gutheil, "Observations on the Theoretical Bases for Seclusion of the Psychiatric Inpatient," Am.J.Psych., March 1978, at 327.

73. See, e. g., Day and Semrad, "Schizophrenic Reactions," The Harvard Guide to Modern Psychiatry (ed. Nicholi 1978), at 236 ("The seclusion room diminishes over-stimulation until the patient can regain control of himself."); D.

Gair, "Freedom Within Limits," presented to the Fourth Annual Children's Advocacy Conference of the New England Children's Mental Health Task Force, Durham, N.H., April 1, 1978 (Seclusion is useful as an aid to "internalization of controls").

74. With respect to plaintiffs' claim of intentional infliction of emotional distress, the court finds that defendants' conduct was not "extreme and outrageous." Agis v. Howard Johnson Co., 371 Mass. 140, ——, 355 N.E.2d 315, 318 (1976). With respect to plaintiffs' state right to privacy claim under M.G.L.A. ch. 214, § 1B, the court finds that the defendants have not unreasonably interfered with plaintiffs' privacy rights so as to justify an award of damages under this tort theory.

In view of the court's disposition of all plaintiffs' state claims for damage there is no need to examine the merit of defendants' proffered defense of immunity to such state claims.